20 A.3d 173

**Michael Anthony TURKES**

v.

**STATE of Maryland.**

No. 2848, Sept. Term, 2009.

Court of Special Appeals of Maryland.

May 26, 2011.

100

102

Peter F. Rose (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Jessica V. Carter (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: EYLER, JAMES R., HOTTEN, J. FREDERICK SHARER, (Retired, specially assigned), JJ.

JAMES R. EYLER, J.

On October 6, 2009, Michael Turkes, Jr., appellant, was tried on a not guilty agreed statement of facts in the Circuit Court for Prince George's County on charges of possession of cocaine and possession with intent to distribute cocaine. That trial followed an October 2, 2009 motions hearing, during which the court denied appellant's motion to suppress evidence. Ultimately, the court found appellant guilty of both charges. On January 8, 2010, the court sentenced appellant to twenty years of imprisonment, suspending all but eighteen months in favor of five years of supervised probation. Appellant then appealed to this Court, challenging the trial court's denial of his motion to suppress evidence. For the reasons set forth below, we shall affirm.

## Factual Background

The following facts were adduced at the motions hearing. On May 2, 2009, at approximately 11:45 a.m., Officer Anthony Smith was patrolling the 6400 block of Greig Street in Prince George's County, when he observed a brown Cadillac with dark-tinted windows drive past him.

Officer Smith's testimony concerning the events that transpired was as follows. The tint on the Cadillac was so dark that Officer Smith could not see who was in the vehicle. Suspecting that the tint was darker than legally permissible, Officer Smith pulled in behind the Cadillac and activated his emergency equipment to make a traffic stop. The Cadillac pulled over immediately, and Officer Smith parked at an angle behind it. Officer Smith's vehicle was about one-half of a car length from the Cadillac, canted to the left a bit.

Appellant, the driver of the Cadillac, then turned off the ignition, exited the driver's side of his car, and quickly started walking towards an apartment building. Officer Smith told appellant to get back in his vehicle. Appellant replied that he could not open the driver's side door, so Officer Smith ordered him to open the passenger's side door. Appellant did so, and, through the passenger's side door, unlocked all the car doors. Then, appellant walked back to the driver's side door. Officer Smith was standing next to appellant when appellant opened the driver's side door. When appellant opened the door, he quickly looked to the left towards a black bag in the door well, and then looked at Officer Smith nervously. This drew Officer Smith's attention to the bag.

Officer Smith described the bag as a black plastic half-gallon sized bag (about 12 inches, or the size of a tissue box). He testified that the bag had mass to it, and that the mass was about the size of a soda can, three to four inches in diameter. At that time, Officer Smith thought that the bag could contain "a weapon, . . . drugs, or anything."

Officer Smith then asked appellant for his driver's license and registration and told appellant that he was stopped because of the tint on his windows. Officer Smith advised appellant that, after receiving a ticket for a repair order, appellant would be free to leave. Officer Smith then told appellant to roll down his windows for safety purposes.

Officer Smith returned to his police car, informed the dispatcher of his location, and called for backup assistance. He noticed that appellant was looking through his rear view

mirror and side view mirrors and pushing or raising up from his seat, with his head going toward the ceiling. According to Officer Smith, those movements seemed "extremely suspicious." With the windows down, Officer Smith could see into appellant's car, but he could not see appellant's hands.

Shortly thereafter, Officer Ivey arrived on the scene to provide backup assistance. Officer Smith and Officer Ivey approached appellant's vehicle. Officer Smith was on the driver's side, and Officer Ivey was on the passenger's side. Officer Smith asked appellant to step out of the vehicle to sign the citation. Officer Smith testified as to why he thought it was important to have appellant exit the car to sign the repair order:

> Due to the initial traffic stop, in exiting the vehicle, while he was under lights and sirens, his nervous behavior, by looking at the bag when he opened the door; the furtive movements in the seat, pushing up from his seat; and continuously looking back through his rearview mirror, coupled with those movements, were very suspicious and there could possibly be a weapon in the vehicle.

As appellant opened the door to get out of his car and sign the repair order, Officer Smith noticed that the black bag was no longer in the door well of the driver's side door. Appellant followed Officer Smith to Officer Smith's police vehicle, and Officer Smith told appellant that he would be free to go once he signed a repair order for the tinted windows. Appellant signed the order. Officer Smith testified that appellant was not in fact free to leave; that he had only told appellant he would be free so that appellant would get out of the vehicle without incident, but that he intended to check the vehicle because he suspected it contained weapons or drugs. Officer Smith explained that he was in the middle of an investigative stop at that point:

> I'm investigating his furtive movements, him exiting the vehicle quickly against my lights and sirens, him nervously looking at a black bag in the door well that had mass to it, the black bag has now disappeared from the door well when

he opens the door the second time, as well as him raising up in his seat, pushing with his head going towards the ceiling and nervously, continuously, over a five-minute time, looking back through his rearview mirror and side view mirror.

Before appellant could walk back to his car, Officer Smith asked appellant if there was anything in the vehicle that he needed to know about. Appellant said no. Officer Smith said that he would check, and according to Officer Smith, appellant consented. Appellant stood with Officer Ivey while Officer Smith checked the car.

Officer Smith checked the "wing span" area of the Cadillac, including the door wells, the space beneath the seats, the dash, and the center console. He could not find the black bag that had been in the door well. Officer Smith returned to appellant and asked him where the black bag was that had been in the door well. Appellant answered that the bag was trash, and that it was underneath the seat. Officer Smith returned to appellant's car and searched the passenger compartment again, but could find no bag. Again, Officer Smith asked appellant where the bag was. According to Officer Smith, appellant replied, "what bag, I don't know what you're talking about."

Officer Smith testified that, at that point, he thought that "whatever was in that bag, whether it could be a weapon or knife, or drugs, or anything, . . . it was now on [appellant]." Officer Smith thus asked appellant to place both hands on the hood of the police car so that Officer Smith could perform a pat-down search for weapons. Using an open hand, Officer Smith began patting appellant down. As Officer Smith's hand came up the inside of appellant's leg, towards the crotch area, appellant pulled his hand from the hood of the car. Officer Smith asked appellant to put his hand back on the car, and began the pat-down again. As Officer Smith's hand approached appellant's crotch area, Officer Smith felt "a very hard object" in between appellant's legs. When Officer Smith pressed upwards on the hard object, appellant pushed off of the car and began to run. Officer Smith grabbed appellant,

and they fell to the ground. Officer Ivey assisted in restraining appellant, who was resisting. Officer Smith told appellant that he was under arrest, and the two officers handcuffed him behind his back.

Once appellant was handcuffed, Officer Smith conducted another search of appellant, who was sitting on the curb between the Cadillac and the police vehicle. As a result of the search, Officer Smith found "[f]our hundred . . . glassine baggies, a razor blade, and 40 grams of crack cocaine, as well as the black bag that was in the door well of the Cadillac." Officer Smith described the search as follows:

[Officer Smith]: . . . After [appellant] was placed in the handcuffs, we turned him over on his—for him to sit on his butt, and I undid the front of his pants, opened it up. And down on the—where I felt the hard object, I saw that there was a very large bulge there. I pulled the inside—on his left leg, I pulled up his underwear there and I could see the black bag, and I pulled it out.

[Prosecutor]: . . . You said that you unbuttoned his pants?

[Officer Smith]: Yes, sir.

[Prosecutor]: Was his pants or his underwear removed?

[Officer Smith]: No, sir. No, sir.

[Prosecutor]: Were they pulled down in any way?

[Officer Smith]: They weren't pulled down, but they were opened. He had—I believe he had a button fly, so I completely undid them, yes, sir. But I didn't pull them off of his body, no.

[Prosecutor]: Were any of his private parts exposed?

[Officer Smith]: No sir.

[Prosecutor]: When you reached in, you said that you reached in through the underwear?

[Officer Smith]: Yes, sir.

[Prosecutor]: Officer, can you describe where the item was found in relation to the Defendant's body and how you went into his pants area?

[Officer Smith]: The item was found underneath his scrotum. I went in, down his left pants leg. So I undid his buttons as far down as I could, opened his pants leg, reached in overhand, over the top of the underwear, from the—I don't know how to explain it. From the bottom piece of his underwear, I went in through the bottom and pulled out the bag and pulled it up and out.

[Prosecutor]: At any time did you see, or were you able to see his—for lack of a better word—his penis?

[Officer Smith]: No, sir.

[Prosecutor]: And was anyone else able to see his penis?

[Officer Smith]: No, sir.

[Prosecutor]: At the time that you did the search was anyone else in this area?

[Officer Smith]: No, sir. Only Officer Ivey.

On cross-examination, Officer Smith testified that the traffic stop occurred about 7–8 blocks from the police department, which is about a five minute drive. He explained that four to five buildings of garden style apartments were approximately 40 yards from the street, with about 15 windows on each building facing the street. On the other side of the street, there were five single-family homes. It was a sunny day, around 11:45 a.m., when the traffic stop occurred.

Appellant's testimony at the motions hearing conflicted substantially with Officer Smith's. Appellant testified that, as soon as he parked, he saw a police vehicle make a u-turn and drive towards him. Appellant stated that he had already gotten out of his car and walked to the door of an apartment when Officer Smith turned on his lights and ordered him to go back to his car. Appellant also testified that there never was a black bag visible in the door well and that Officer Smith just made up the fact that he saw the bag in the door well as an "excuse ... for [the] search." Further, appellant claimed that he never gave Officer Smith consent to search the vehicle. Appellant also denied running from the officers during the pat-down. Appellant testified that he was uncomfortable when Officer Smith began unbuckling his pants, so he pushed

Officer Smith off of him. In other words, appellant was not trying to resist or leave, but was merely reacting to an uncomfortable search.

Appellant's account of the subsequent search of his person also differs substantially from Officer Smith's. On direct examination, appellant testified as follows:

[Appellant]: ... [F]or the record, I had on boxer briefs, not boxers. It was hard to go under boxer briefs, you know. So he pulled my—he unbuckled my pants. He had my pants halfway down while I was sitting on the curb, with my boxer briefs down, and that's how he went under my scrotum, underneath my scrotum area and everything.

[Defense Counsel]: Now, when you say unbuckled your pants, what did he do with your pants?

[Appellant]: Well, as I'm in restraints, he unbuckled my pants and he unloosened my belt. I had fly buttons. He unbuttoned those. Then he pulls them down. And then, he also pulls my boxer briefs down with them. That's when—

[Defense Counsel]: He pulls them? How far down does he pull these?

[Appellant]: I'd say about, mid-like, close to my—close to like, or parallel to my scrotum area.

. . .

[Defense Counsel]: So you're saying your pants and your boxers were both pulled down?

[Appellant]: As I was sitting on the curb, yes.

[Defense Counsel]: And you're telling me that this area was completely exposed?

[Appellant]: Yes.

[Defense Counsel]: And for the record, the area where—or what bodily parts are there that were completely exposed?

[Appellant]: My scrotum and my penis.

[Defense Counsel]: They were completely visible?

[Appellant]: Yes.

[Defense Counsel]: Your penis was completely visible.

[Appellant]: Yes.

[Defense Counsel]: Your testicles completely visible?

[Appellant]: Yes.

[Defense Counsel]: Your pubic hair—

[Appellant]: Yes.

[Defense Counsel]:—was completely visible?

[Appellant]: Yes.

[Defense Counsel]: And it was right there on Greig Street?

[Appellant]: Yes.

[Defense Counsel]: Was there anything blocking you while—well, was the cruiser blocking you?

[Appellant]: No. I was actually in between the—this is the cruiser, and you could say this is my car, so I was actually sitting here, in between, like this.

[Defense Counsel]: Was you—

[Appellant]: There was no blockage.

[Defense Counsel]: was your penis, all your private parts, were they completely visible to all of these windows—

[Appellant]: Right.

[Defense Counsel]:—the 60 or so windows—

[Appellant]: Correct.

[Defense Counsel]:—of the apartments?

[Appellant]: Yes. Well, you could say the houses, because my back was towards the apartments.

[Defense Counsel]: Your back was. But they were completely visible to all the apartments?

[Appellant]: Yes.

[Defense Counsel]: And you're telling me that it wasn't a reaching under, that he actually pulled down—

[Appellant]: Yeah.

[Defense Counsel]:—your underwear?

[Appellant]: You can't reach under boxer briefs when they fit tight to your leg.

At the close of the hearing, the court concluded that neither the initial stop nor the search of appellant's person was illegal. With respect to the stop, the court stated simply that:

It appears to the Court that the officer believed that the tint was too dark, that there was no other reason for the stop, and that the officer did have a reasonable and articulable suspicion of the violation of the law.

Turning to the question of the search of appellant's person, the court made several findings. First, the court deemed credible Officer Smith's testimony that "after being stopped by the police . . . [appellant] was observed moving about in the car in a suspicious manner and that he appeared very nervous and that at one point he tried to flee." Further, the court "believe[d] that the officer had seen a black bag in the car, . . . and that it was no longer there after the defendant had been left in the car with it," which "caused [Officer Smith] a great deal of concern." To that end, the court discredited appellant's testimony that "there was never a black bag in the door, [and] that the officer never saw this bag."

With respect to the bag's appearance, the court found that "the bag, which has been described as the length and size of a Kleenex box . . . was not just a . . . small baggie that would be likely to be drugs; but that this was large enough that it could [contain] weapons as well."

In terms of the reasonableness of the search, the court noted that "the search does need to be considered under all of the factors such as the scope of the intrusion, the manner it was conducted in, the justification that initiated it and the place that it was conducted."

First, the court found that "the search was really a reach in," acknowledging the "big difference between the officer's testimony and [appellant's] testimony" on this point. The court reasoned as follows:

The officer testified that during the pat down he felt an object that was in [appellant's] pants, and that the officer then unbuckled his belt and unbuttoned the pants, opened the pants, reached into [appellant's] underwear—and I be-

lieve that it was between the underwear and the skin—and he reached down to [appellant's] scrotum to remove the bag that [appellant] had hidden on his body, but on his scrotum. The Court is not convinced that the defendant is being truthful in testifying that the police pulled his pants down so that all of his genitals were exposed, and that the police, with his bare hand, reached into his underwear and to pull out the bag. I'm betting that this was not a bare hand that reached in.

With respect to the place of search, the court found that the search occurred "right there on a city street, in broad daylight, near residences. There's houses across the street and apartments to the back of [appellant]." Further, the court noted,

although no person was identified as having people standing in and around and observing this, or who were watching it from some other site, it's certainly reasonable to assume that someone, either in cars driving by or in any of the homes, could have observed this.

Thus, the court concluded that "the location [was] certainly not [one] of any privacy whatsoever to [appellant]."

Nevertheless, the court deemed Officer Smith's justification for the public search reasonable. Specifically, the court found that:

the police, upon determining that [appellant] had some type of an object in his pants—and that it was not his own natural body parts—had reason to be concerned that this may be a weapon. You know, like a razor blade, if not a gun. . . . [T]his, again, was not a small baggie that would just indicate that there were just drugs in it; that this was larger, that this was more substantial, and it has been described as one that caused the police officer to be concerned that it could be a weapon as likely as any other object.

The court then concluded that if Officer Smith had merely suspected that the hard object could be drugs, the search would have been unreasonable because, under that scenario,

appellant could simply have been transported to a less public place. But because the officer feared there may have been a weapon involved, "the concern for [appellant's] privacy loses out to the greater concerns as to the safety of the officers and anyone else who may [have been] in any danger" if appellant had in fact possessed a weapon.

Thus, the court denied appellant's motion to suppress. Appellant challenges that denial on appeal. Additional facts will be incorporated as necessary in the discussion below.

### Standard of Review

We defer to the trial court's fact-findings at the suppression hearing unless the findings were clearly erroneous. *Bailey v. State*, 412 Md. 349, 362, 987 A.2d 72 (2010). Where the court's fact-findings are either "(1) ambiguous, (2) incomplete, or (3) non-existent[,]" the appellate Court can turn to the following "supplemental rule of interpretation" in order to "fill those fact-finding gaps[:]"

> In determining whether the evidence was sufficient, as a matter of law, to support the ruling, the appellate court will accept that version of the evidence most favorable to the prevailing party. It will fully credit the prevailing party's witnesses and discredit the losing party's witnesses. It will give maximum weight to the prevailing party's evidence and little or no weight to the losing party's evidence. It will resolve ambiguities and draw inferences in favor of the prevailing party and against the losing party.

*Morris v. State*, 153 Md.App. 480, 489–90, 837 A.2d 248 (2003).

The suppression hearing court's legal determinations, unlike its fact-findings, are paid no deference on review. *See Wilkes v. State*, 364 Md. 554, 569, 774 A.2d 420 (2001) ("We will review the legal questions *de novo* and based upon the evidence presented at the suppression hearing and the applicable law, we then make our own constitutional appraisal.").

### Discussion

Appellant offers five arguments on appeal: (1) the traffic stop was initiated without reasonable articulable suspicion; (2)

appellant was held after the purpose of the initial traffic stop ended and was thus subject to a "second stop," which was not supported by reasonable articulable suspicion; (3) the search of appellant's car was not supported by reasonable articulable suspicion; (4) the frisk of appellant was not supported by reasonable articulable suspicion; and (5) appellant was improperly strip-searched in a public area.

Only the first and fifth arguments were made at trial. Thus, appellant has waived the remaining three arguments, and they are not properly before us on appeal. This Court has held that the failure to argue a specific theory in support of a motion waives that argument on appeal. *See* Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any [non-jurisdictional] issue unless it plainly appears by the record to have been raised in or decided by the trial court....."); *Evans v. State*, 174 Md.App. 549, 557, 922 A.2d 620 (2007). Nevertheless, for completeness, we consider the merits of the unpreserved arguments and conclude that, were they preserved, they would lack merit. For ease of analysis, we have consolidated appellant's second, third, and fourth arguments into one.

*1. Reasonable Suspicion in Support of the Initial Traffic Stop*

Appellant argues that the initial traffic stop was not supported by a reasonable articulable suspicion, and thus "any evidence flowing there from should have been suppressed at trial." We disagree.

When an officer observes a vehicle that is in violation of window tint regulations, the officer may stop the driver of the vehicle and, in addition to issuing a citation charging the driver with the offense, may issue to the driver a safety repair order. *State v. Williams*, 401 Md. 676, 934 A.2d 38 (2007). In *Williams*, the Court of Appeals summarized Maryland law requirements as to vehicle window tinting as follows:

The amalgam of these statutes and the MVA–ASED regulation is that (1) post-manufacture tinting is permissible pro-

vided that it allows at least 35% light transmittance and other conditions set forth in the regulation, including the requirement that a label stating the percentage of light transmittance be permanently attached to the window between the glass and the tinting material, are satisfied, but (2) if a police officer observes a vehicle being driven on a highway that is not in compliance with those requirements, the officer may stop the vehicle and issue both a citation for the traffic offense and a vehicle equipment repair order.

*Id.* at 685, 934 A.2d 38. The Court in *Williams* explained that a traffic stop is justified under the Fourth Amendment if the officer has a reasonable articulable suspicion that a traffic law has been violated. *Id.* at 690, 934 A.2d 38. In the absence of objective measurement of the tint, which may not be feasible prior to a stop, the following standard applies:

If an officer chooses to stop a car for a tinting violation based solely on the officer's visual observation of the window, that observation has to be in the context of what a properly tinted window, compliant with the 35% requirement, would look like. If the officer can credibly articulate that difference, a court could find reasonable articulable suspicion, but not otherwise.

*Id.* at 692, 934 A.2d 38.

 Further, applicable regulations require that a label or sticker be placed on a window that has post-manufacturing tinting. *Id.* Thus, if an officer stops a car based solely on visual inspection, the officer could check the car for an inspection sticker to determine whether the sticker indicates that the tint is in compliance with the law. *Id.* at 692 n. 3, 934 A.2d 38. If there is no reason to believe the sticker is not genuine, there would be no reason to continue detaining the motorist. *Id.* However, if there is no label, or the label appears to be not genuine, "that alone may justify a citation ..., a repair order, and some further investigation." *Id.*

In this case, Officer Smith stopped appellant on a sunny morning. Officer Smith testified that, when he saw appellant's vehicle, he was unable to see into the vehicle at all to tell

the number of occupants in the car or to distinguish movement in the car. He also did not see an inspection sticker on the tint. He testified that he had approximately 8 to 10 seconds to observe the car before initiating a stop.

Those facts justified the stop, especially in light of Officer Smith's training and experience in recognizing legally tinted windows. Officer Smith testified that he was familiar with the appearance of a legal tint at 35% and had observed the difference between legal and non-legal tints during traffic stop training at the police academy. He also had conducted at least 100 traffic stops for tinted windows. Officer Smith noted that, based on his training and experience, if a window's tint is legal, a person should be able to see into the window because sunlight can get through. We affirm the trial court's finding that the stop was supported by a reasonable articulable suspicion.

2. *Reasonable Articulable Suspicion to Support a "Second Stop," a Search of Appellant's Vehicle, and a Frisk of Appellant's Person*

Appellant argues that (1) Officer Smith "continued to hold [appellant] after the purpose of the original stop was effectuated, thereby conducting an unlawful 'second stop[,]' [which was] unsupported by reasonable suspicion or probable cause[;]" (2) the search of appellant's car was not supported by reasonable articulable suspicion; and (3) the frisk of appellant was not supported by reasonable articulable suspicion. Although these arguments were not preserved for appeal, we address their merits below.

As the Court of Appeals explained in *Ferris v. State*, 355 Md. 356, 735 A.2d 491 (1999),

the officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally per-

missible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot. 355 Md. at 372, 735 A.2d 491 (citations omitted).

■ We agree that appellant was subjected to a "second stop" because Officer Smith continued to detain appellant after appellant signed the citation for the tinting violation, which marked the conclusion of the initial stop. *See Id.* at 373, 735 A.2d 491 ("We conclude ... that the traffic stop essentially came to an end upon the trooper's delivery of the citation, and return of the driver's license and registration."); *Charity v. State*, 132 Md.App. 598, 753 A.2d 556 (2000) (explaining that in *Ferris*, the initial traffic stop ended "[a]t the moment when Trooper Smith returned Ferris's driver's license and registration card to him and handed Ferris a copy of the speeding citation"). However, we conclude that the "second stop" in the case *sub judice* was supported by reasonable articulable suspicion.

■ The reasonableness of any intrusion is based on an objective standard—"whether a reasonably prudent person in the officer's position would have been warranted in believing that ... criminal activity ... was afoot." *Ferris*, 355 Md. at 384, 735 A.2d 491. We shall not give weight to an officer's "inchoate" or "unparticularized" suspicion or mere "hunch." *Id.* at 384–85, 735 A.2d 491 (citations omitted). Rather, we look for "specific reasonable inferences" that the officer drew from the facts in light of his experience. *Id.* (citations omitted). The concept of "reasonable articulable suspicion" cannot be "reduced to a rigid analytical framework or a set of specific, bright-line rules." *Id.* Rather, any determination of reasonable articulable suspicion must be based on the circumstances as a whole. *Id.*

■ Factual circumstances that " 'describe a very large category of presumably innocent travelers' cannot, in and of themselves, justify a seizure." *Id.* (citing *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980)). However, acts that might be innocent when viewed separately may

provide a basis for reasonable suspicion when viewed together. *Id.* (citing *United States v. Sokolow,* 490 U.S. 1, 9–10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). In *Ferris,* the Court of Appeals explained that *"Reid* and *Sokolow,* taken together, demonstrate [that] it is not enough that law enforcement officials can articulate reasons why they stopped someone if those reasons are not probative of behavior in which few innocent people would engage—the factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." *Id.*

As discussed, Officer Smith's reasons for detaining appellant after appellant signed the citation were as follows: (1) the fact that appellant exited the vehicle when first pulled over; (2) the fact that appellant nervously looked in the door well at the black bag, which had mass to it, and then back at Officer Smith; (3) the fact that, while Officer Smith was in the police vehicle, appellant was "nervously, continuously, over a five-minute time [period], looking back through his rearview mirror and his side view mirror[;]" (4) the fact that Officer Smith could see from the police vehicle that appellant was "raising up in his seat, pushing up with his head going towards the ceiling[;]" and (5) the fact that the black bag was missing from the door well when Officer Smith returned to appellant's vehicle and asked appellant to step out. The court made specific findings as to several of those factors, stating:

> The Court finds credible testimony that after being stopped by the police ... [appellant] was observed moving about in the car in a suspicious manner and that he appeared very nervous and that at one point he tried to flee. The officer had—I believe had seen a black bag in the car, when he observed it, and that it was no longer there after [appellant] had been left in the car with it.

The court made no specific findings as to the remaining factors. We shall "fill those fact-finding gaps" by viewing the remaining factors in a light most favorable to the party that prevailed below—here, the State. *See Morris v. State,* 153 Md.App. at 489–90, 837 A.2d 248. Accordingly, we accept as

true *all* of Officer Smith's professed reasons for detaining appellant after he signed the citation.

We conclude that, at the point where appellant signed the citation and the initial stop ended, those factors, in the aggregate, justified further detention. Although the factors, viewed individually, may not have given rise to a reasonable articulable suspicion, we discuss them separately below.

Turning to the first factor (Officer Smith's testimony that appellant exited the vehicle after being pulled over) we note that the Court of Appeals held in *Ransome v. State*, 373 Md. 99, 816 A.2d 901 (2003), that an officer's testimony was *not* supported by sufficient articulable facts, in part because the defendant "did not take evasive action or attempt to flee." 373 Md. at 110, 816 A.2d 901 (emphasis added). In contrast, appellant in the case *sub judice* did exit the vehicle "quickly against [Officer Smith's] lights and sirens," locking the driver's side door.

The next two factors concern appellant's nervousness during the stop. In *Whitehead v. State*, 116 Md.App. 497, 698 A.2d 1115 (1997), we explained that "[t]he nervousness, or lack of it, of the driver pulled over by a Maryland State trooper is not sufficient to form the basis of police suspicion that the driver is engaged in the illegal transport of drugs." 116 Md.App. at 505, 698 A.2d 1115. In finding no reasonable articulable suspicion to support a second stop, the Court of Appeals in *Ferris* cited *Whitehead* and a long list of cases in other jurisdictions, in which courts have cautioned against placing too much reliance on a suspect's nervousness when analyzing reasonable suspicion. 355 Md. at 387–89, 735 A.2d 491. The *Ferris* Court held that "the case at bar is not one where the suspect's nervousness can fairly be characterized as especially 'dramatic,' or in some other way be objectively indicative of criminal activity." *Id.* at 389, 735 A.2d 491. The Court reasoned that the suspect's "unexceptional nervousness, in reaction to encountering [the officer], was simply too ordinary to suggest criminal activity." *Id.* The Court also stated that the fact that the suspect and his passenger "turned around

three or four times to look back at [the officer] is hardly evidence of criminal activity." *Id.* at 389–90, 735 A.2d 491.

Thus, the fact that appellant nervously checked his rear and side view mirrors during the stop, standing alone, could not give rise to reasonable suspicion. Neither could appellant's general nervousness during the stop. Those considerations could fit "a very large category of presumably innocent travelers." *Id.* (citing *Reid,* 448 U.S. at 441, 100 S.Ct. 2752). However, appellant's nervousness was not merely "ordinary" or "unexceptional" nervousness. *Id.* Appellant's nervousness was piqued specifically by the black bag. Appellant's specific attention to the bag was more "objectively indicative of criminal activity" than general nervousness during a stop.

When combined with the factors above, the last two factors-appellant's raising up in his seat, and the black bag's removal from the door well-provided a basis for reasonable suspicion. Appellant was nervous about the black bag, was shifting around when left alone in his car, and had removed the bag from the door well by the time Officer Smith returned to the car. "[P]resumably innocent travelers" would not engage in that behavior.

■ We turn next to appellant's argument that the search of his car was not supported by reasonable suspicion. Citing to *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Court of Appeals in *McDowell v. State,* 407 Md. 327, 965 A.2d 877 (2009), stated that reasonable suspicion may justify the search of the passenger compartment of a vehicle. 407 Md. at 335, 965 A.2d 877. The standard articulated in *Michigan v. Long* is as follows:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain control of weapons.

463 U.S. at 1049, 103 S.Ct. 3469 (citations omitted). The same factors that justified detention after the initial stop ended justified the search of appellant's car. As discussed above, the court found that "the bag ... was large enough that it could [contain] weapons as well [as drugs]." Officer Smith was thus justified in suspecting that "there could possibly be a weapon in the vehicle," and the search of appellant's car was legal.

▆ The frisk of appellant's person was also legal. The Court of Appeals has reiterated the standard for conducting a frisk for weapons:

> Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous ... and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is reasonable under the Fourth Amendment.

*McDowell*, 407 Md. at 334–35, 965 A.2d 877 (quoting *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The McDowell Court explained further that:

> In justifying the need for the particular intrusion, 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion' and, in assessing whether the officer has done so, the facts must be judged against an objective standard....

*McDowell*, 407 Md. at 334, 965 A.2d 877 (citing *Terry*, 392 U.S. at 21, 88 S.Ct. 1868).

Officer Smith initiated a pat-down of appellant after noticing that the black bag was no longer in the door well, nor anywhere in the passenger compartment, and after appellant had lied to him about where the bag was and then claimed not to know anything about the bag at all. At that point, Officer

Smith worried that "whatever was in that bag, whether it could be a weapon or knife, or drugs, or anything, . . . it was now on [appellant]." Again, we emphasize the court's finding that the bag had bulk and was large enough to contain a weapon. Those "specific and articulable" facts, when coupled with the factors discussed above that justified the "second stop," the search of appellant's vehicle, and the frisk.

### 3. Reasonableness of Strip–Search

Appellant's next contention is that he was subjected to an illegal strip search. Though preserved for appeal, this argument lacks merit. To determine whether the search of appellant's person subsequent to his arrest was reasonable, we look to the following four factors set forth by the United States Supreme Court in *Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979):(1) the scope of the intrusion; (2) the manner in which the search was conducted; (3) the justification for initiating the search; and (4) the place in which the search was conducted. *Allen v. State,* 197 Md.App. 308, 323 (2011). "*Bell* requires a flexible approach, one that takes into account the relative strength of each factor" and balances "the need for a particular search against the invasion of personal rights that the search entails." *Paulino,* 399 Md. 341, 355, 924 A.2d 308 (2007) (quoting *Bell,* 441 U.S. at 599, 99 S.Ct. 1861).

The Court of Appeals applied the *Bell* factors to a search incident to arrest in *Paulino,* 399 Md. at 355–61, 924 A.2d 308. In *Paulino,* police found drugs between Paulino's buttocks. *Id.* at 346–47, 924 A.2d 308. Ultimately, the Court of Appeals held that "the search of Paulino unreasonably infringed on his personal privacy interests when balanced against the legitimate needs of the police to seize the contraband that Paulino carried on his person." *Id.* at 361, 924 A.2d 308.

With respect to the scope factor, an officer that searched Paulino described the search as follows:

[Detective Latchaw]: Well, when we—when Mr. Paulino was removed from the vehicle and laid on the ground, his

pants were already pretty much down around his—below his butt ... so it was just a matter of lifting up his shorts, and—and between his butt cheeks the drugs were—I believe one of the detectives actually put on a pair of gloves and just spread his cheeks apart a little bit and it was right there.

[Defense Counsel]: So they were not visible before you actually spread his cheeks apart, is that correct?

[Detective Latchaw]: I don't think they were.

*Id.* at 346, 924 A.2d 308. Paulino offered a different version of the scope of search:

[Mr. Paulino]: They had searched me in my pockets, didn't find nothing, and eventually, they came to the subject where—in my report, it states that the officer said, Mr. Paulino, why is your butt cheeks squeezed? And in further response, I said nothing. He said it again, and another officers come behind with gloves and pulled my pants down and went in my ass. Well, my cheeks. Sorry about that.

*Id.*[1] On appeal, Paulino argued that "the scope of the intrusion involved in the [search of his person] was great[,]" as he had to "suffer the indignity of having an officer view his naked body" and had to "endure the humiliation of having an officer physically manipulate his buttocks." *Id.* at 355–56, 924 A.2d 308. The Court of Appeals agreed, holding that "the police officers' search of Paulino was highly intrusive and demeaning." *Id.* at 356, 924 A.2d 308.

Turning to the location and manner factors,[2] the Court in *Paulino* noted that the search was conducted at night in a well-lit parking lot of a car wash within plain view of people who were not involved in the search itself. *Id.* at 360, 924 A.2d 308. The fact that members of the public were present

---

**1.** The Court of Appeals set forth both versions of the facts in its opinion, stating that what happened after the stop of Paulino was unclear. 399 Md. at 346, 924 A.2d 308.

**2.** The Court in *Paulino* analyzed the location and manner factors together. 399 Md. at 357, 924 A.2d 308.

was crucial in the Court's conclusion that the search location was illegal:

It is [the presence of members of the public], whether their view was obscured or otherwise, that makes the search of Paulino unnecessarily within the public view and thus violative of the Fourth Amendment.

*Id.*

The State in *Paulino* described the justification for the search of Paulino as follows: "... the police had sufficient cause to believe that the illegal narcotics Paulino was known to be possessing were actually being concealed in that place." *Id.* at 356, 924 A.2d 308. The police had arrested Paulino pursuant to information provided by an informant. *Id.* at 344, 924 A.2d 308. The informant had told the police that Paulino would be at a certain location in Dundalk, Maryland that evening, and would be in possession of a quantity of controlled dangerous substance. *Id.* "The informant also advised the police that Paulino typically hides the controlled dangerous substance in the area of his buttocks." *Id.* Ultimately, the Court of Appeals in *Paulino* concluded that "the police officers were justified in initiating the search of Paulino[,]" but that the officers were not justified in "searching him to the extent he was searched under the circumstances." *Id.* at 357, 924 A.2d 308.

In *Allen*, 197 Md.App. at 312–13, officers performed searches incident to arrest on two defendants—Mr. Allen and Mr. Smith. The officers in *Allen* retrieved drugs from between the defendants' buttocks. *Id.* Like the Court of Appeals in *Paulino*, this Court applied the *Bell* factors to determine the legality of the searches. *Id.* at 323–27, 13 A.3d 801. Ultimately, we held that the searches were "reasonable under the Fourth Amendment." *Id.* at 327, 13 A.3d 801.

In terms of scope and manner,[3] the search of Mr. Allen was as follows:

---

3. It appears that the *Allen* Court analyzed the "scope" and "manner" factors together. 197 Md.App. at 324–25, 13 A.3d 801.

Detective Beal ... first searched Mr. Allen's pockets and pant legs, and then he checked for 'slits in the waistband area of his pants,' but he did not find any narcotics. Detective Beal then pulled back Mr. Allen's pants and saw a plastic bag 'protruding' from between his buttocks. While holding the waistband of Mr. Allen's pants out, Officer Beal directed Mr. Allen to 'spread his legs and squat.' A bag dropped from between Mr. Allen's buttocks to 'his underwear area,' and Officer Beal 'reached in and pulled it out.' The bag contained 28 orange ziploc bags filled with narcotics. Officer Beal testified that he did not touch Mr. Allen while recovering the narcotics. . . .

*Id.* at 312–13, 13 A.3d 801. The search of Mr. Smith was as follows:

Detective Wiman pulled back the waistband of Mr. Smith's pants and saw 'a plastic baggy kind of coming up through ... his cheeks.' The bag was 'kind of half concealed' in Mr. Smith's buttocks area. Detective Wiman then 'reached down and pulled it out.' The bag contained 24 ziploc bags filled with narcotics.

*Id.* at 313, 13 A.3d 801. The trial court in *Allen* "found the testimony of the police officers to be credible, specifically finding as a fact that no one but the officers conducting the searches could see inside appellants' pants." *Id.* at 314, 13 A.3d 801. It also found that, "with respect to each appellant, his 'genitalia [was] not exposed, his anus [was not] exposed,' and the officer merely 'reached in' appellant's pants with 'no manipulation.' " *Id.* at 314, 13 A.3d 801. On appeal, this Court held that "the scope and manner of the searches were not unreasonable" in part because "the police officers merely pulled the appellants' pants and underwear away from their waist, ... [a]ppellants' clothing was not removed and the private areas of their bodies were not publicly exposed." *Id.* at 324, 13 A.3d 801.

With respect to the location of the search, an officer in *Allen* described the search as follows: "there were a series of storage garages on one half of the block, which was divided by

a wide alley, and residential homes on the other side of the block." *Id.* at 313, 13 A.3d 801. The search in that case "was conducted near the storage garages." *Id.* There were no civilians in the area, and no one, including the other officers present, could have observed the defendants' buttocks, especially because "the officer stood directly behind [each suspect] and he was the only one who could see appellants' buttocks during the search." *Id.* at 324–25, 13 A.3d 801.

In terms of justification for the searches in *Allen,* the officers arrested the defendants after the officers saw the defendants engaging in what the officers believed was a drug transaction. *Id.* at 312, 13 A.3d 801. We concluded that "the police had justification for the searches, given that they were 'incident to a lawful arrest for narcotics distribution, and it was reasonable for the police to believe that Mr. Allen and Mr. Smith were concealing drugs on their persons.'" *Id.* at 323, 13 A.3d 801. We reasoned that "it is 'well known in the law enforcement community, and probably to the public at large, that drug traffickers often secrete drugs in body cavities to avoid detection.'" *Id.* at 324, 13 A.3d 801 (quoting *Moore v. State,* 195 Md.App. 695, 718 (2010)). After balancing the *Bell* factors, we held that the searches in *Allen* were reasonable under the Fourth Amendment. *Id.* at 327, 13 A.3d 801.[4]

---

**4.** Although this opinion focuses closely on *Paulino* and *Allen* because those cases are the most squarely on point, we note briefly that several other cases have analyzed the reasonableness of strip searches in Maryland. *See, e.g., State v. Harding,* 196 Md.App. 384, 9 A.3d 547 (2010) (examining the justification required to expand a routine search incident to arrest into a strip search); *Moore v. State,* 195 Md.App. 695, 706–16, 7 A.3d 617 (2010) (discussing the prudence of transporting a suspect to the police station in order to conduct a strip search pursuant to a search warrant); *Stokeling v. State,* 189 Md.App. 653, 672–73, 985 A.2d 175 (2009) (examining the reasonableness of transporting a suspect to the police station in order to conduct a strip search incident to arrest); *Nieves,* 383 Md. at 586–98, 861 A.2d 62 (detailing jurisprudence regarding the reasonableness of strip searches in Maryland and deeming unreasonable a strip search of a suspect conducted at the police station incident to the suspect's arrest for a minor traffic violation); *Aguilar v. State,* 88 Md.App. 276, 280, 287, 594 A.2d 1167 (1991) (holding that the scope of a *Terry* frisk did not permit the officer to remove the suspect's underclothing where nothing was felt during the

We now apply the *Bell* factors to the facts in the case *sub judice.* In terms of scope and manner,[5] we agree with the trial court that the search of appellant was a "reach-in" search, as opposed to a full-fledged strip search. "A 'reach-in' search involves a manipulation of the arrestee's clothes such that the police are able to reach in and retrieve the contraband without exposing the arrestee's private areas." *Paulino,* 399 Md. at 360 n. 6, 924 A.2d 308. In a "reach-in" search, "clothing is pulled away from the body but not removed." *Allen,* 197 Md.App. at 322. By contrast, a strip search involves either "the removal of the arrestee's clothing for inspection of the under clothes and/or body," *State v. Nieves,* 383 Md. 573, 586, 861 A.2d 62 (2004), or "the removal or rearrangement of some or all clothing to permit the visual inspection of the skin surfaces of the genital areas, breasts, and/or buttocks" *Paulino,* 399 Md. at 352–53, 924 A.2d 308 (quoting *Nieves,* 383 Md. at 586, 861 A.2d 62). A "reach-in" search where no one, including the officers, sees the defendant's private parts is, in some sense, less invasive than a full-blown strip search. *See Allen,* 197 Md.App. at 322–23 ("To be sure, a 'reach-in' search may be less invasive than a search requiring a suspect to remove his or her clothing. To the extent that it *allows an officer to view a person's private areas,* however, it still is intrusive and demeaning.") (emphasis added).

In the case *sub judice,* the trial court credited Officer Smith's description of the search and discredited appellant's. Thus, the court concluded that, like the officers in *Allen,* Officer Smith merely reached into appellant's underwear, rather than pulling the underwear down or otherwise exposing appellant's private parts to the public. The court also believed that, unlike in *Paulino,* neither officer even saw appellant's private parts themselves. Under the appropriate standard of

---

frisk yet the officer continued to search for a weapon by pulling the suspect's pants and underwear down).

5. We find it logical to analyze the scope and manner factors together, as in *Allen,* 197 Md.App. at 325, 13 A.3d 801.

review, we defer to those credibility findings. We thus conclude that the search in this case was merely a "reach-in" search, during which appellant's private parts were visible to no one.

With respect to the location of search in this case, we note that the search occurred in broad daylight in front of a public apartment complex and several single-family homes that faced the road on which the search occurred. The officers made no attempt to transport appellant to the police station, which was 7–8 blocks away. Appellant testified that, during the search, he was seated on the curb, facing the single-family homes and with his back to the apartments. Although he was seated in the space between his own vehicle and Officer Smith's vehicle, "[t]here was no blockage" (*i.e.*, he was not shielded from public view). Although, unlike in *Paulino,* no evidence suggests that members of the public were *in fact* present at the scene, residents of the apartments and houses on either side of the search, along with potential passerby, *could* potentially have viewed the scene. Thus, the location of the search was not a private location.

We must now weigh the scope, manner, and location of the search against the last *Bell* factor—justification for the search. We hold that, in this case, the exigency of the search outweighed any intrusion on appellant's privacy. In fact, the urgency of the search in this case was much greater than that in *Paulino* and *Allen.*

First, in both *Paulino,* 399 Md. at 356, 924 A.2d 308, and *Allen,* 197 Md.App. at 312, 13 A.3d 801, the officers' purported justification for the search was that the officers believed the defendants were possessing illegal narcotics. In this case, Officer Smith was reasonably concerned that appellant had not only drugs, but a *weapon* on his person. More specifically, Officer Smith was confronted with the fact that the black bag, which was big enough to contain a weapon, was missing; that appellant had lied to him twice by telling him the bag was under the seat and then by telling him he did not know anything about a black bag; and that appellant resisted the

pat down and tried to flee when Officer Smith felt something hard in appellant's crotch area. Because Officer Smith reasonably suspected that appellant was hiding a weapon, an immediate and relatively intrusive search was warranted. Indeed, in holding that the public location of the search of Paulino was *not* justified by sufficiently exigent circumstances, the Court of Appeals in *Paulino* reasoned as follows:

> There was no testimony at the suppression hearing . . . that Paulino was attempting to destroy evidence, *nor that he possessed a weapon* such that an exigency was created that would have required the police officers to search Paulino at that precise moment and under the circumstances, in a 'well-lit' public car wash.

399 Md. at 360, 924 A.2d 308 (emphasis added); *see also State v. Smith*, 345 Md. 460, 469, 693 A.2d 749 (1997) ("Where [a] pat-down reveals a hard object that the police officer reasonably believes may be a weapon, the officer may further intrude upon the individual to the extent necessary to seize the suspected weapon."). The fact that appellant's hands were cuffed behind his back does not alter our analysis. The officers could reasonably have feared that if they transported appellant to the police station and appellant was indeed hiding a weapon between his legs, appellant could access the weapon while sitting in the back of the police vehicle.

Second, Officer Smith's belief that contraband of any type was hidden on appellant was even more justified than the officers' belief in both *Paulino* and *Allen*. Again, in *Paulino*, the officers suspected that Paulino was hiding drugs between his buttocks because an informant had told police that Paulino would be at a certain location with controlled dangerous substances, which Paulino typically hid in the area of his buttocks. 399 Md. at 344, 924 A.2d 308. Likewise, in *Allen*, the officers' belief that drugs were hidden in the defendants' buttocks was based solely on the fact that the officers witnessed the defendants engaging what they thought was a drug trade, and the fact that drug traffickers in general frequently hide drugs in body cavities to avoid detection. 197 Md.App. at 312, 324, 13 A.3d 801. By contrast, in the case *sub judice*,

130

Officer Smith had already conducted a pat-down, during which he *actually felt* a hard object that he believed could be contraband.

Having weighed the *Bell* factors, we conclude that the search was legal under the circumstances.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**