*Shawna Lynn Faith v. State of Maryland*, No. 1040, Sept. Term 2018.  Opinion filed on August 2, 2019, by Berger, J.


CRIMINAL LAW - CONSTITUTIONAL LAW - FOURTH AMENDMENT - REASONABLENESS OF INTIMATE ROADSIDE SEARCH

The non-exigent visual inspection of the genital area of a person suspected of concealing controlled dangerous substances, in daylight, while the person stood between two police cruisers with emergency lights flashing, along the shoulder of an interstate highway, as moderate to heavy traffic passed and the searchee's companion and young child watched, violated the searchee's Fourth Amendment right to be free from unreasonable searches.

Circuit Court for Frederick County
Crim. No. 10-K-17-060009

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1040

September Term, 2018

_____

SHAWNA LYNN FAITH

v.

STATE OF MARYLAND

_____

Berger,
Leahy,
Harrell, Glenn T., Jr.
      (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Berger, J.

_____

Filed:  August 2, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Based on evidence recovered during a warrantless search at the scene of a traffic stop, the Circuit Court for Frederick County, in a bench trial, convicted Shawna Lynn Faith ("Faith"), appellant, of possessing cocaine with the intent to distribute. Faith contends that the suppression court erred in denying her request to exclude "the evidence recovered from a warrantless strip search . . . conducted on the side of Interstate 70 in the presence of two civilians and other police officers in which her underwear was pulled from her body and her vaginal area exposed[.]"

This appeal requires us to decide whether such a visual body search, in which a female officer conducted a "look-in" at Faith's genital area, was reasonable under the Fourth Amendment, given the public manner and location in which that search occurred. Because the State failed to establish any exigent reason to perform this inspection on the shoulder of a highway in the presence of onlookers, instead of a more private setting that would lessen the intrusion into Faith's personal privacy, we shall reverse her conviction. In doing so, we revisit the constitutional limits on sexually invasive searches like the one at issue here.

## BACKGROUND

Before trial, Faith moved to suppress both the controlled dangerous substances ("CDS") recovered and the statements she made during and after the challenged search, on the grounds that (a) this was a "visual body cavity" search that is unreasonable under constitutional standards, and (b) her statements were obtained from a custodial interrogation that occurred before she received *Miranda* advisements. The suppression court denied the motion as to the drug evidence but granted it as to Faith's statements

before she was Mirandized. Because the sole issue in this appeal is whether the court erred in failing to suppress the drug evidence, our focus is on the suppression record summarized below. *See Lewis v. State,* 398 Md. 349, 358 (2007).

At 7:18 p.m. on April 21, 2017, Frederick County Sheriff's Deputy Douglas Storee[1] "was doing traffic enforcement" in a marked police vehicle "on Interstate 70 at Route 144, the New Market Inn," which is "at Exit 55." Storee observed Faith's vehicle "following too closely, within a car and a half length" of another vehicle traveling westbound at the 70 mph speed limit in "moderate to heavy traffic[.]" When Storee initiated a traffic stop, Faith's vehicle pulled over on the right shoulder of the highway "at South Street[.]"

Faith was in the driver's seat, a female companion was in the passenger seat, and Faith's three-year-old son was in the back seat. Faith was wearing cut-off jean shorts and a top that did not cover her arms.

While informing Faith of why he made the stop, Deputy Storee noticed track marks on her arms, which "is common for someone that's administering CDS intravenously." The deputy asked where Faith was coming from. She answered that they were returning home to Cumberland, after taking "someone else's child down to Baltimore[.]" Storee considered a five-hour round trip for that purpose to be "odd." During the conversation, he observed that the two women "seemed to be squinting, which appeared . . . that maybe

---

[1] Deputy Storee's first name appears in subpoenas rather than the suppression hearing transcript.

they were under the influence of drugs" because "[s]ometimes eyes can be sensitive to light."

Storee returned to his vehicle and requested a K-9 unit at the scene. A marked cruiser occupied by Deputy Miller Yackovich and K-9 Officer Ike arrived two minutes later, at 7:22 p.m., while Storee was still completing paperwork regarding the stop. In accordance with standard procedures, the occupants were asked to vacate the vehicle before the canine scan began. After pat-down searches yielded no suspected weapons, all three individuals were "walked back" from Faith's car to Storee's vehicle.

The dog alerted at the doors of Faith's car. Deputy Storee, having called for an officer to "conduct a female search[,]" proceeded to search the vehicle.

Storee's search yielded drug paraphernalia and crack cocaine. A "glass pipe" with burnt residue that Storee believed to be crack cocaine was found under the driver's seat. A "metal spoon" commonly used to mix and inject heroin was "in the driver's compartment door" with "a whitish-tannish residue" that Storee, "based on [his] training and experience," believed to be heroin. In a purse "on the floorboard" by the front passenger seat was "a bag of crack cocaine[,]" divided into Ziploc packets. That purse contained identification belonging to Faith's passenger.

While Storee was searching the vehicle, Faith, her companion, and her child stood with Deputy Yackovich "on the bumper along the passenger side of" Storee's vehicle, which was "lined up behind the suspect vehicle." Yackovich's cruiser was next in line behind Storee's vehicle. Both police cars had their lights flashing throughout the stop.

3

While that vehicle search was underway, Sergeant Amanda Ensor arrived, parking her marked vehicle, also with lights flashing, as the fourth car lined up along the shoulder of Interstate 70. Deputy Storee had done "multiple" "female searches" with Sergeant Ensor "[i]n the field[.]" The sergeant also had "done female searches on [Deputy Yackovich's] traffic stops[.]"

According to Yackovich, he did not know whether Sergeant Ensor routinely "looks underneath females' clothes" because "[t]he way she searches is up to her." According to Storee, "typically we – especially if it's a female, they'll take them to the rear of the vehicle, away from everybody else." Storee explained that during Sergeant Ensor's searches, he does not "look because things happen . . . . from people doing things on their own, not necessarily just because of a search." Although he claimed that he "never expect[s] someone's vagina is going to be exposed on the side of the road[,]" he acknowledged that in the past, "things happened where people have pulled their clothes off in their own excitement[.]"

While it was still daylight outside, Sergeant Ensor searched Ms. Faith. As moderate to heavy traffic passed on the highway, and Faith's companion and son stood with Deputy Yackovich at the front of Deputy Storee's vehicle, Sergeant Ensor "took Ms. Faith back to the rear of" that vehicle, a car-length away. According to Deputy Storee and Deputy Yackovich, Faith was searched while standing "between [Storee's] vehicle and Deputy Yackovich's vehicle[,]" while "facing into oncoming traffic," with her back to the male officers and vehicle passengers. During the search, both deputies testified, they were

4

"facing away" from Faith because "obviously there's a privacy issue." Yet Storee did "try to keep an eye as best [he could] on Sergeant Ensor[.]" And Faith's companion, who was holding her son, was next to Deputy Storee.

Sergeant Ensor testified that her search of Ms. Faith was consistent with her routine practice for roadside searches involving suspected CDS. On direct, she recounted that during her fifteen years as a police officer, she had been "frequently called to conduct female searches." She had "[s]everal hours at the academy in the detection of deception and behavior" and "too many" trainings "to name[,]" "in addition to conducting numerous arrests [herself] and assisting and aiding with other arrests for deputies." She estimated that she had conducted "[t]housands" of "female searches[.]"

When asked about her typical approach to such a search, she detailed her standard operating procedure, as follows:

> [PROSECUTOR]: And what's your procedure when you arrive on the scene to conduct a female search?
>
> [SGT. ENSOR]: **Systematically for an incident like this where we're on a heroin interdiction operation and we are specifically looking for criminal behavior. I have a systematic approach to my searches. Basically, I do take the person's – their feelings, everything into account. Their reaction to me, their behaviors, their statements, their inconsistencies in stories; and my searches stem from there, but they're always systematic.**
>
> I initially ask them if they have anything on them. I let them know specifically if they do and I'm typically very confident that they do have something on them that I will find it. I ask if they have anything that's going to poke me, stick me, anything like that. Sometimes they will be honest and say yes. Others, they won't tell you. And in this specific case, the

5

defendant had obvious track marks on her arms, which are consistent with intravenous needle drug use.

So my initial search, I start with the upper body and – let me back up. I'll take – if it's a female, I take them away from the male deputies and anyone else that's in the vehicle, and I either position them behind the first police vehicle w[h]ere the public can't see them or what I'm doing in my search. And the other deputies can't see them, because obviously I'm the only female on the scene.

**They call me there for a reason. I'll search their waistband. I'll ask them to unbutton their pants and pull their pants away from them. At no point in time do I touch them or their private areas. I ask them to pull their pants away from them.** If I don't see anything obvious, that would be secreted or, you know, in their underwear, I'll move up and I'll say I want you to leave your shirt down so no one else can see you, but if you're wearing a bra, pull it away from you.

And I will bend down and look up underneath their shirt. So I'm not touching them. Again, I'm not touching them. I've hand [sic] instances where women will hold one side of their bra in and pull the other out, which would tell me that they're hiding contraband in that area. And again, that's where I find it.

**In this specific situation, I pull her underwear, her shorts out away from her.**

[PROSECUTOR]: Okay, we'll get to that. But first of all, so now when you ask them to do this, are you in any way exposing their intimate parts?

[SGT. ENSOR]: No, absolutely not. **I say pull them away from you and I specifically say do not pull them down, just pull them away from you, because I will be honest. I have people on the side of the road that have been arrested and they know the process of strip searches and being in detention, and they have absolutely no problem flashing the entire highway.**

6

**And I specifically say, don't pull your shirt up. Leave it down. Just hold it away from you. And I'm going to look up underneath your shirt to make sure you don't have anything. And some will just expose everything and not – you know, and it's no big deal to them. And others, it's just like I said – I use a systematic approach for the searches.**

[PROSECUTOR]: Okay, and do you at any point during this, touch the female at all? When you're looking either – like when you ask them to pull their waistband away or when you're looking up underneath their bra?

[SGT. ENSOR]: No, in those two instances, absolutely not. **I don't touch them. In some instances, depending on what they're wearing, if I feel like they haven't – you know, they haven't pulled them out away from them enough or that I couldn't really see if they have large breasts, I will use the back of my hand to search the outside of their breasts in the interior.**

[PROSECUTOR]: Okay.

THE COURT: Do you – when you ask someone to pull their pants out, do you see – you said nothing is exposed to anybody else, but you can actually see?

[SGT. ENSOR]: **I can see. And typically, the portion that I can see is whether or not – I mean, I can see if they have a pad on. I can see basically the front portion. If they're pulling their underwear away from the, I can see like the front of their vagina.**

THE COURT: Right.

[SGT. ENSOR]: And obviously if something is exposed, I mean, the strangest things. Like people say, I'm on my period. Or you know, I don't have anything and this instance you pull them away from you, don't pull them down. **I specifically say that – just pull them out away from your body. And in this specific instance, there happened to be a condom hanging out.**

THE COURT:  Okay, so basically when you said no one could see, nobody else could, but you could, but that's the purpose, you have to see because you're conducting the search?

[SGT. ENSOR]:  Absolutely.

THE COURT:  **You ask them specifically to pull their pants away from their body?**

[SGT. ENSOR]:  **I do.**

THE COURT:  You look in there.  You've taken them away from the male deputies, the public and any other people that might be – that privacy might be invaded –

[SGT. ENSOR]:  Absolutely.  **I'm very respectful.  I'm a female.  I know what it's like.  It is, it's an intrusion of their privacy.  And if I wasn't 99 percent sure and confident by their reactions and their behavior to my questions and me interacting with them, that they were concealing something on their person, then I would handle it differently.**  But 99.9 percent of the times with these searches, especially with the influx in heroin and fentanyl coming through, I have found contraband on them.

**And that's not looking in their private area.  That's something that's clearly exposed when they hold their pants away from their body and not pull them down.  I move them – for their safety and well-being and their privacy, I move them away for my officer safety and take myself to another situation where I'm moving them behind the vehicle and I'm by myself and leaving the other male deputies up at the vehicle so that they can't see anything.**

THE COURT:  Okay, so this is not a strip search?

[SGT. ENSOR]:  No, absolutely no.

THE COURT:  Okay, go ahead.

[PROSECUTOR]:  **And when you look down, when they pull their pants away, can you see their vaginal cavity?**

8

[SGT. ENSOR]:  **Not the cavity, no.**

[PROSECUTOR]:  And so now have you testified – have you been qualified as an expert in female searches?

[SGT. ENSOR]:  I have.

[PROSECUTOR]:  In Frederick County?

[SGT. ENSOR]:  Yes.

(Emphasis added.)

Turning to the specifics surrounding the search of Ms. Faith, the prosecutor elicited from Sergeant Ensor that she had observed the traffic violation while she and Deputy Storee were both positioned "in the crossover" on "I-70 facing westbound traffic[.]"  After receiving a call from Deputy Storee to come perform "a female search," Sergeant Ensor followed her routine practice by positioning Faith between two police vehicles for the search, as follows:

> [PROSECUTOR]:  And what did you do when you did that search?
>
> [SGT. ENSOR]:  **Again, my systematic search.  I asked her to come back behind Deputy Storee's car.**
>
> [PROSECUTOR]:  And so when you asked her to come back behind Deputy Storee's car, where was the passenger and the child?
>
> [SGT. ENSOR]:  **They were still up at the vehicle, because the child needed to be held by her friend.  So they were still up at her vehicle in that vicinity on the grass area of the shoulder with Deputy Storee and Deputy Yackovich.**
>
> [PROSECUTOR]:  And where did you take Ms. Faith?

9

[SGT. ENSOR]: Behind Deputy Yackovich's canine car.[2]

[PROSECUTOR]: Okay.

[SGT. ENSOR]: And my car was behind his.

[PROSECUTOR]: And approximately how much space was between the two vehicles, Deputy Storee's and Deputy Yackovich?

[SGT. ENSOR]: I would say maybe three feet.

[PROSECUTOR]: Okay. And did you take her – where did you take her between the two vehicles?

[SGT. ENSOR]: **Basically, right at the trunk. And I had them – I will put my back to the other units and what I'll do is I'll have them position themselves so that their back is to traffic but they're also hidden by the vehicle, so none of the other deputies or occupants in the vehicle can see me do my search.**

[PROSECUTOR]: Okay. Did you do that with Ms. Faith?

[SGT. ENSOR]: Yes.[ 3]

 (Emphasis added.)

The prosecutor then inquired about Sergeant Ensor's statements to Ms. Faith before the search began, eliciting the following description of her tactical approach to that conversation:

---

[2] Consistent with Sergeant Ensor's initial testimony that she directed Ms. Faith "to come back behind Deputy Storee's car[,]" Deputies Yackovich and Storee testified that Sergeant Ensor performed the search while Ms. Faith was standing between their two vehicles, which put the male deputies and vehicle passengers one car length from the search.

[3] As set forth above, both Deputy Storee and Deputy Yackovich contradicted this, testifying that Faith was positioned so that she was facing toward oncoming traffic.

[PROSECUTOR]: **And did you have a conversation with her?**

[SGT. ENSOR]: **Absolutely. I do with everyone.**

[PROSECUTOR]: **And what was the nature of the conversation?**

[SGT. ENSOR]: **Well, obviously, the track marks that were present on her arms,** she had a child in the vehicle. I'm a mom myself, and one of my conversations was about her taking her child down the road to Baltimore and she explained that she knew she needed to get clean. **She had obvious track marks on her arms. I asked her how long she's been using, because I genuinely care about them and getting clean, we have a conversation about that initially. And that's also my way of detecting their behavior and whether or not they're nervous.**

Inconsistencies in their stories with the passengers – because they'll say the last exit that they passed. She did not in this case, but they'll use reference points. And the other passenger will have a completely different story. **So I use that, you know, that talking point to build my suspicion, my reasonableness and talking to her about getting clean and her using needles and addicted to heroin.**

She was wearing extremely short shorts. And one of the things I look for is whether or not their body is shaking. Because typically when I'm asking personal questions about their drug use, you know, they lie constantly to their families. They lie to their friends about they're going. So when I ask questions about their drug use, they start to become increasingly nervous.

So you know, I was watching her legs and her demeanor. And when I started to ask the other questions about how long have you been using, who got you hooked on that? Like how long? And she said, I know, I need to quit. I and [sic] reached up and looked at her arm. You know, very softly, like turned her arm around to look at the track marks. And I noticed that her arm was shaking really bad. Fast.

11

You know, but almost – you know, obviously not a cold shake, but she was shaking. **So that's when I told her that I'm going to search you. I've been doing this for 15 years, and if you're hiding something on your person or in your vagina – I said that to her – or in your vagina, I will find it.**

**And it's a tactic that I use to get them to talk to me about, you know, what's going on, what they might have on them. And she still – she still denied the fact that she had anything on her.**

(Emphasis added.)

Next, the prosecutor focused on Sergeant Ensor's inspection of Ms. Faith's vaginal area, as follows:

[PROSECUTOR]: Okay. And so what did you do next?

[SGT. ENSOR]: **That's where I start my systematic search. And I start with her shorts, not pants at the time – and I'll say unbutton your shorts. Don't pull them down. I'm very specific. Unbutton your shorts, don't pull them down. I want you to pull them away from your body. And when she did that is when I saw the condom protruding.**

[PROSECUTOR]: Okay. And what did you do at that point? Did you touch her?

[SGT. ENSOR]: **No. I looked at her and I said, come on. You know, like – I saw it, come on. And we actually had an intelligible conversation about the fact that, you know, she said it's not mine. I don't do coke. Dealer is in Cumberland. I carry it back for them. They give me heroin.** It was an honest conversation that we had about what she was holding. I didn't touch her. I asked her to walk back up to the car and I asked Deputy Yackovich to grab me a bag.

[PROSECUTOR]: Okay, and when she told you about the – going up to Cumberland and all that, was that in response to a question you asked?

12

[SGT. ENSOR]: **No. It was conversation because she knew that I saw it.**

[PROSECUTOR]: So you looked at her and said come on, and she said what?

[SGT. ENSOR]: **Right, because I said, tell me if you have anything on you. I'm going to find it. And as soon as she pulled her pants away from her body and her underwear, there was a clear condom that would be the shaft portion of the condom hanging out like down in her underwear. It was very obvious. So of course I looked at her, and I said, come on. Like – you just lied to me. I see it. And then it was a conversation.**

It wasn't me questioning her – whose is it? Where did you get it? You know, I didn't ask her any questions because I knew it was there. I saw it. So I asked Deputy Yackovich for a bag and **she elected not to go back to be stripped searched and said no, I can just get it myself.** Fully clothes [sic]. Shorts up, underwear up. She said she could retrieve it herself and did so, with only me watching her after Deputy Yackovich handed me the bag.

[PROSECUTOR]: **And did you offer her to go back to the Law Enforcement Center to retrieve it?**

[SGT. ENSOR]: **Yes**.

[PROSECUTOR]: **And what did she say?**

[SGT. ENSOR]: **She said no, I can get it myself. I'll get it out.**

[PROSECUTOR]: So where did she got [sic] to retrieve it?

[SGT. ENSOR]: **Obviously that needed to be a little bit – a little more private so I wouldn't have her like squat down behind the vehicle to get it, we walked back up to her vehicle and she saw [sic] on the edge of the passenger seat. And again, the deputies were not around when she was retrieving it. I ensured that they weren't watching her and nobody was looking at her, not even her friend and her**

**child were in close proximity, because she specifically didn't want her child to see.**

[PROSECUTOR]: Was this the passenger side door facing the road or facing the shoulder?

[SGT. ENSOR]: **The shoulder, facing the grass area. And the door was obviously blocking it**. Deputy Storee's car was behind hers. **And she's full clothed when she reaches in her underwear and pulls the condom out of the side of her shorts.**

[PROSECUTOR]: Okay. And at any point, did she expose her vagina?

[SGT. ENSOR]: **No, and she actually – she pulled the condom out of the side of her shorts and she put it in the bag for me.**

[PROSECUTOR]: Okay, and she was the one that suggested that she do that, correct?

[SGT. ENSOR]: Yes. . . .

[PROSECUTOR]: Did you ask her any questions before she said that?

[SGT. ENSOR]: No. Just about like how long have you been using, not specific to the drugs or what I saw, no.

[PROSECUTOR]: Okay.

[SGT. ENSOR]: **I just looked at her and I said come on. I mean, it's obvious what it is. Girls don't – it's not natural for a girl to store a condom in her vagina.**

[PROSECUTOR]: And after you retrieved it, did she remain clothed the whole time?

[SGT. ENSOR]: Yes.

(Emphasis added.)

At that point, the prosecutor asked Sergeant Ensor to explain why she searches suspects at the side of the road, rather than after transporting them to the Law Enforcement Center:

> [PROSECUTOR]: **Why do you do a female search on the scene as opposed to going back to the Law Enforcement Center right away?**
>
> [SGT. ENSOR]: **One, for their safety, health reasons. If they're carrying something like that inside of their body** –
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Sustained.
>
> [PROSECUTOR]: Your Honor, I think **it's relevant. According to the case law, I mean, whether or not it's reasonable for them to have been doing this type of search where they were doing it.**
>
> THE COURT: Okay. Overruled.
>
> [PROSECUTOR]: **So what's the reasons that you do this?**
>
> [SGT. ENSOR]: **Well, I mean, many factors come into play. Number one, it's not a strip search on the side of the road. If there's something concealed that I truly – I can't see by asking them to pull their clothing away from them,** but I still believe based on their demeanor, their inconsistences in their stories, their body language, you know, often times they'll look at the other occupant that's not close to them, whether it be a male or female and you can see that they're reading off of them to see, you know, oh, crap, do they know?
>
> Did they tell them anything? It's body language that I've watched for 15 years. **So these systematic searches, they're not strip searches on the side of the road. At no point in time is any part of their body exposed. If I needed to do a strip search because I truly cannot see or can't find that contraband, but I have reasonable suspicion, there's needles in the car. There's needle caps. There are**

15

**inconsistencies in their stories. And I suspect that they are concealing something, that is when we'll take them back and do a strip search.**

**Doing these types of searches on the side of the road when no parts of their body are exposed** and they're more than willing to get the drugs out themselves and hand them to me, quite honestly most of the time, the females will just give it to me. I tell them, I am confident that you have something on you. And they will give me the drugs.

[PROSECUTOR]: And does that negate the need for a strip search back at the Law Enforcement Center a lot of times?

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

[PROSECUTOR]: **As a result of this, did you need to conduct a strip search of Ms. Faith?**

[SGT. ENSOR]: **No**.

(Emphasis added.)

At the outset of cross-examination, defense counsel confirmed that Sergeant Ensor's roadside search of Ms. Faith was consistent with her frequent practice:

[DEFENSE COUNSEL]: Sergeant Ensor, you do this a lot?

[SGT. ENSOR]: Yes, sir.

[DEFENSE COUNSEL]: Okay, so how many times have you seen somebody's vagina on the side of the road, would you estimate?

[SGT. ENSOR]: I'm not – can you rephrase the question? I'm not sure what you –

[DEFENSE COUNSEL]: I'll withdraw the question.

16

Defense counsel then elicited additional details about Sergeant Ensor's search of

Ms. Faith:

> [DEFENSE COUNSEL]:  I'm going to approach with what's marked as Defense Exhibit No. 1.  Can you flip through those and tell me if you recognize those?
>
> [SGT. ENSOR]:  Recognize a pair of shorts?
>
> [DEFENSE COUNSEL]:  Yes.  Do you recognize that outfit?
>
> [SGT. ENSOR]:  I'm not sure what you're asking me.  If they're similar to the ones that she was wearing, as far as length – I don't know if they're the exact shorts that she was wearing, if that's what you're asking me.  But as far as length, with the pockets hanging out about two inches and extremely short, they're similar to the ones that she was wearing, but I don't know it they're the exact pair. . . .
>
> [DEFENSE COUNSEL]:  All right, so you say systematically that your search involves two parts, one in the shorts and one in the shirt, is that correct?
>
> [SGT. ENSOR]:  Typically, yes, where contraband is concealed.
>
> [DEFENSE COUNSEL]:  Okay.  And in this case, you looked both in her shirt as well as in her shorts?
>
> [SGT. ENSOR]:  Shorts first. . . .
>
> [DEFENSE COUNSEL]:  **So in this specific case, you told her to unbutton your shorts, and to pull your shorts out towards you so that you could see inside?**
>
> [SGT. ENSOR]:  **Correct.  Obviously, if she leaves them buttoned, she can't pull that and her underwear away for me to see in her underwear.**
>
> [DEFENSE COUNSEL]: **And so you also tell her to pull her underwear out?**

17

[SGT. ENSOR]:  **Away from her body, correct.**

[DEFENSE COUNSEL]:  **And that allows you to see her genitalia?**

[SGT. ENSOR]:  **I can see the front portion of her vagina, correct.**

[DEFENSE COUNSEL]:  **You saw enough of her vagina in this case where you were able to describe it as a condom protruding from her vagina?**

[SGT. ENSOR]:  **I saw enough of a condom coming out of her vagina in her underwear, correct.**

(Emphasis added.)

Inside the condom that Faith removed at the scene were "18 individual bags[,]" each "weighing the same amount," and "another bigger bag[,]" with all 19 bags containing what "looked to be" crack cocaine.  At that point, Faith "was placed under arrest]" handcuffed, and "read . . . her Miranda rights."  Her companion was also arrested and handcuffed "after the female search."  Thereafter, Faith

> admitted that she went up to Baltimore to get drugs from a supplier for a drug dealer back in Cumberland.  That drug dealer gets fronted drugs from a supplier in Baltimore and she takes them back and gives them to that drug dealer in exchange for her own personal getting drugs back from that dealer in Cumberland.

The State argued that the search did not violate Fourth Amendment protections because "[t]he amount of intrusion on the defendant was extremely minimal" given that Ms. Faith "was not exposed to anyone other than Sergeant Ensor[,]" who "took every step possible to try and ensure this defendant's privacy."  Pointing to cases in which "the

18

intrusion was far greater[,]" the prosecutor emphasized that there was no touching or "manipulation" of the body, no removal of clothing, and "no testimony . . . that the passenger or her child could see anything" or "that vehicles were stopping and looking." To the contrary, the prosecutor argued, this roadside search "led to a benefit of the defendant, a lesser intrusion" in that Faith did not have "to go back to the Law Enforcement Center and have a full strip search."

Defense counsel challenged the constitutionality of both the roadside search and the custodial interrogation. Counsel argued that "[w]e have a strip search" under the Court of Appeals's definition, which expands that term beyond removal of clothing to include any "rearrangement of some or all clothing to permit the visual inspection of the skin surfaces of the genital areas, breast, and/or buttocks." According to defense counsel, because Faith was required "to unbutton her pants, to pull her pants out, to expose her vagina[,]" allowing Sergeant Ensor "to visually observe . . . the genital vaginal cavity of Ms. Faith" where she saw "a condom coming out[,]" the scope of the search was "a visual body cavity search[.]"

Disputing the justification for that type of search, defense counsel insisted that even though "[t]he sergeant may think that she's concealing drugs, . . . you can't strip search somebody on a hunch." In support, counsel argued that the search could not have been incident to arrest because "there has been no testimony that the dog hit or that they found evidence in the car prior to this strip search taking place." At best, he maintained, the "dog hit" gave police "probable cause to search the car, not the former occupants."

19

Moreover, defense counsel objected that Sergeant Ensor had no "reason to conduct it now as opposed to in a different manner at the Law Enforcement Center or at the detention center[.]" Regarding the manner and location of the search, counsel argued:

> It was on side of 70 in front of the former occupants of the vehicle, in front of the other deputies. And it's in a position where there's three marked patrol vehicles all with their lights flashing, moderate to heavy traffic. I think it's a fair inference that every single person that passes by is watching and looking at what's going on.

In these circumstances, counsel contended that the search was unconstitutional:

> So for all of these reasons, I think every one of these factors cuts in favor of suppression. I think that **the entire public policy surrounding the exclusionary rule is to deter this kind of behavior by the police. What you have is a police officer systematically conducting strip searches on the side of the road. And that's a bad place for us to be.** And . . . if you exclude the evidence, sure, in this particular case, a potential criminal may go free. But that's the price that we pay to make sure that this kind of behavior doesn't continue on and I believe that that's the place where we are here today.

(Emphasis added.)

With respect to Faith's incriminating statements, defense counsel argued that the unlawful search was compounded by unlawful custodial interrogation:

> What we have is **an interrogation during the strip search.** She made incriminating statements. Then Ms. Faith was Mirandized and then she gave an incriminating statement. It's a classic two-step interrogation procedure that should be suppressed in violation of <u>Miranda</u>, in violation of the Maryland Declaration of Rights.

(Emphasis added.)

20

The suppression court denied Faith's motion to exclude the evidence recovered in the search but questioned the admissibility of her statements made without a *Miranda* warning. In response, the State argued that after Faith was placed under arrest by Deputy Storee and Mirandized, "it's a break" with subsequent incriminating statements made to "a separate officer." The court then took the *Miranda* issue under advisement and allowed counsel to submit authority on the issue. At a later hearing, the suppression court ruled that Faith's statements before she received *Miranda* advisements were inadmissible but declined to exclude subsequent statements.

After the drug evidence obtained from the roadside search and the admissible statements were presented via an agreed statement of facts, the trial court, sitting as fact-finder, convicted Faith of possessing cocaine with the intent to distribute. Ms. Faith was sentenced to twenty years with all but eighteen months suspended, plus three years of probation. This timely appeal followed.

**DISCUSSION**

Faith contends that "the trial court erred in denying [her] motion to suppress the evidence recovered from [the] strip search conducted in the open on the side of Interstate 70 in the presence of two civilians and other officers in which her underwear was pulled from her body and her vaginal area was exposed." Applying lessons from *Paulino v. State*, 399 Md. 341 (2007), and other modality cases addressing sexually invasive searches, we conclude that this roadside search was unreasonable, and therefore unconstitutional, in light

21

of the manner, location, and non-exigent circumstances in which it was conducted. Our reasoning follows.

## I. Fourth Amendment Standards Governing Sexually Invasive Searches

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures shall not be violated[.]" U.S. Const. amend. IV. Applicable to the States through the Fourteenth Amendment, this constitutional guarantee "prohibits searches that are 'unreasonable under the circumstances.'" *Paulino v. State*, 399 Md. at 349 (citation omitted). Under established Fourth Amendment jurisprudence, the State bears the burden of rebutting the presumption that a warrantless search, such as the one at issue here, was unreasonable. *See id.* at 348.

Evidence obtained as a result of an unconstitutional search may be challenged via a motion to suppress. *See Sizer v. State*, 456 Md. 350, 364 (2017). Appellate review of a suppression ruling requires that

> we defer to that court's findings of fact unless we determine them to be clearly erroneous, and, in making that determination, we view the evidence in a light most favorable to the party who prevailed on that issue, in this case the State. We review the [suppression] court's conclusions of law, however, and its application of the law to the facts, without deference.

*Taylor v. State*, 448 Md. 242, 244 (2016) (citations omitted).

"Police are allowed to conduct a search incident to arrest in order 'to remove any weapons the [arrestee] might seek to use in order to resist arrest or effect his escape . . .

22

[or] to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.'" *Paulino*, 399 Md. at 350 (quoting *Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 2040 (1969), *overruled in part on other grounds in Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710 (2009)).  Because "searching without a warrant is always considered a strictly limited right that grows only out of the inherent necessity of the situation at the time of the arrest[,]" "[i]n the situation where the destruction or removal of evidence is urged as justifying a warrantless search, it must be a situation where there was an immediate, urgent, and compelling need for the police action." *Stackhouse v. State*, 298 Md. 203, 215-16 (1983).  "Where a warrantless search is based upon the destruction or removal of evidence[,] the surrounding circumstances must present a specific threat to known evidence." *Id*. at 213.  Moreover, "the burden of establishing exigent circumstances is on the State, and . . . the facts and circumstances upon which the question of reasonableness depends must be viewed in the light of established fourth amendment principles." *Id*. at 217.

Under this "exigency rationale," police may search an arrestee's outer garments, including pockets. *See Paulino*, 399 Md. at 351; *Stackhouse*, 298 Md. at 211-12.  But the Fourth Amendment "protects an arrestee's privacy interests in his person and prohibits bodily intrusions that 'are not justified in the circumstances, or which are made in an improper manner.'" *Paulino*, 399 Md. at 351 (quoting *Schmerber v. California*, 384 U.S. 757, 768, 86 S. Ct. 1826, 1834 (1966)).  When a search proceeds beyond "a routine custodial search," to a strip search, body cavity search, or other sexually invasive search,

23

"the necessity for such an invasive search must turn upon the exigency of the circumstances and reasonableness[,]" because "[w]ithout the constitutional safeguards of exigent circumstances and reasonableness, every search incident could result in a strip search." *Id.* at 351.

The Fourth Circuit recently reviewed the analytical framework used to evaluate sexually invasive searches, as follows:

> When . . . a search involves "movement of clothing to facilitate the visual inspection of a [person's] naked body," the search qualifies as a type of "sexually invasive search." *United States v. Edwards*, 666 F.3d 877, 882-83 (4th Cir. 2011) (citations omitted). To determine whether a sexually invasive search is reasonable, we employ the test adopted in *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S. Ct. 1861 (1979).
>
> **Under the *Bell* framework, we balance the invasion of personal rights caused by the search against the need for that particular search. 441 U.S. at 559, 99 S. Ct. 1861. Pursuant to *Bell*, we examine the search in its complete context and consider the following factors: (1) the scope of the particular intrusion; (2) the manner in which the search was conducted; (3) the justification for initiating the search; and (4) the place in which the search was performed.** *Id.*
>
> . . . . [W] observe that **a sexually invasive search "constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." Courts have described such searches, including strip searches, as terrifying, demeaning, and humiliating.** When the scope of a search exceeds a visual inspection of an individual's naked body, the magnitude of the intrusion is even greater.

*Sims v. Labowitz*, 885 F.3d 254, 260-61 (4th Cir. 2018) (emphasis added; some citations omitted).

In reviewing a sexually invasive search, appellate courts are charged with "taking into account the relative strength of each factor and balancing the need to ferret out crime against the invasion of personal rights[.]" *Williams v. State*, 231 Md. App. 156, 185 (2016), *cert. dismissed*, 452 Md. 47 (2017). Accordingly, "*Bell* requires that a reviewing court, when assessing the reasonableness of a search under the Fourth Amendment, balance 'the need for a particular search against the invasion of personal rights that the search entails.'" *Paulino*, 399 Md. at 355 (quoting *Bell*, 441 U.S. at 559, 99 S. Ct. at 1084). Even when police have sufficient grounds for a sexually invasive search,

> there is also the distinct question of the modality of conducting such a search. The concern in such a case is not with justification at all, but rather with the manner in which even a fully justified further search or examination is carried out. Those modality concerns focus on such things as privacy or unnecessary embarrassment or hygienic conditions or, in the more extreme cases, medical risk to the health of the suspect.

*State v. Harding*, 196 Md. App. 384, 397 (2010), *cert. denied*, 418 Md. 398 (2011).

## II. *Paulino v. State*

Maryland appellate courts have addressed modality concerns regarding undue invasion of privacy in a number of appeals challenging sexually invasive searches conducted in both public and private locations. The Court of Appeals's leading modality decision in *Paulino v. State*, 399 Md. 341 (2007), addresses the constitutional limits of a sexually invasive search conducted in public at the scene of an arrest.

After police learned from a confidential informant that Paulino would be in possession of CDS at a certain place and time, and that Paulino "typically hides the CDS

25

in the area of his buttocks," they arrested Paulino while he was a passenger in a vehicle at a car wash. *See id*. at 344-45. The location was "back" off the road, through a parking lot, "past an entrance to a storage facility" and "an auto repair center[,]" in a "secluded" area "all by itself." *Id*. at 345. Although it was 11:15 p.m., the area was "well-lit." *Id*. at 346. There were "[n]o civilian personnel" around other than the occupants of Paulino's vehicle. *Id*. at 346, 360 & n.7.

Paulino "was removed from the vehicle and laid on the ground." *Id.* at 346. A police officer then reached into his pants and removed a quantity of cocaine. *See id.* In the course of that search, police lifted up the already exposed waistband of his shorts, then "spread his cheeks apart a little bit" with a gloved hand, "to allow for a better view of his anal cavity" because "the drugs were not visible until after the cheeks of Paulino's buttocks were spread apart." *Id*. at 353-54.

The Court of Appeals recognized that sexually invasive searches, which it referred to collectively as strip searches, may vary in scope, explaining that

> [a] "strip search," though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. **A "visual body cavity search" extends to a visual inspection of the anal and genital areas.** A "manual body cavity search" includes some degree of touching or probing of body cavities.

*Id*. at 352 (emphasis added; citation omitted). After considering cases discussing different search modes, the Court concluded that the search of *Paulino* was both a strip search and a visual body cavity search. *See id*. at 352-53. In doing so, the Court observed that if "the drugs were protruding from between the cheeks of Paulino's buttocks and visible without

26

spreading his buttocks cheeks, the classification of this type of search would be a close one." *Id*. at 353-54.

Applying the four *Bell* factors, the Court held that the search was unreasonable "in light of the manner and place in which [it] was conducted at a time when there were no exigent circumstances justifying the immediate search." *Id.* at 344. Writing for the majority, Judge Greene explained that,

> [b]y definition a strip search involves a more invasive search of the person as opposed to a routine custodial search. Therefore, **the necessity for such an invasive search must turn upon the exigency of the circumstances and reasonableness. Without the constitutional safeguards of exigent circumstances and reasonableness, every search incident could result in a strip search.** As we have said, "[t]he meaning of exigent circumstances is that the police are confronted with an emergency – circumstances so imminent that they present an urgent and compelling need for police action."

*Id.* at 351 (emphasis added; citation omitted).

The *Paulino* majority held that the scope of that search was "highly intrusive and demeaning," given the visual inspection and manipulation of Paulino's anal area. *See id*. at 356. The Court observed that

> [t]he type of search that Paulino was subjected to, and **other searches that "entail[] the inspection of the anal and/or genital areas have been accurately described as demeaning, dehumanizing, undignified, humiliating, embarrassing, repulsive, degrading, and extremely intrusive of one's personal privacy."**

*Id*. at 356 (quoting *Amaechi v. West*, 87 F. Supp. 2d 556, 565 (E. D. Va. 2000), *aff'd*, 237 F.3d 356 (4th Cir. 2001)) (emphasis added).

Although police had justification to initiate the search, *id*. at 357, "the crux of this case . . . [was] not whether police had a right to search Paulino, but instead whether an exigency existed such that an invasive search conducted at the scene of the arrest was reasonable." *Id*. at 357.

The Court found that both the manner and place of the search were unreasonably public:

> The testimony from the suppression hearing in the case *sub judice*, viewed in the light most favorable to the State, does not indicate that the officers made any attempt to protect Paulino's privacy interests. The search was conducted in the very place in which he was arrested, a car wash. Similarly, there is no indication in the record before us that the police made any attempt to limit the public's access to the car wash or took any similar precaution that would limit the ability of the public or any casual observer from viewing the search of Paulino.

*Id*. at 358. Because "there is no evidence that the search of Paulino was shielded from the view of passers-by or the people present at the scene[,]" "the search as conducted was unreasonable." *Id*. at 358, 359-60.

In reaching that conclusion, the Court of Appeals considered cases from other jurisdictions. *See id.* at 358-60. In *McGee v. Texas*, 105 S.W.3d 609, 612-13 (Tex. Crim. App. 2003), the defendant was arrested without a warrant on suspicion of selling crack cocaine, driven to a nearby fire station, and taken to a secluded location in that building, where officers conducted a visual body inspection, revealing CDS "in plain view lodged between McGee's buttocks." *Id*. at 613. The Texas Court of Criminal Appeals held the visual search was reasonable under the circumstances, noting it was performed in a

28

hygienic and private location. *See id*. at 617. The Texas court agreed with Fourth Circuit jurisprudence "that visual body cavity inspections should not be conducted in a public place." *Id*.

The Court of Appeals also contrasted Paulino's search against another reasonable search reviewed in *United States v. Williams*, 477 F.3d 974 (8th Cir. 2007). *See Paulino*, 399 Md. at 359. After obtaining a warrant to search Williams's home and person for drugs, but before executing that warrant, police conducted a traffic stop of Williams's vehicle "on a busy street." *Id*. at 975. A pat-down search led police to suspect there was something inside Williams's pants. *Id*. Police "decided not to search Williams more extensively while on the street because they were concerned about his privacy." *Id*. Instead, they transported him several blocks to a nearby precinct. *Id*. After removing him from the police car, he was searched in a parking lot at the rear of that building, a fenced location where the search was shielded from street view. *Id*. There, "[t]he officer, who was wearing a latex glove, opened Williams's pants, reached inside Williams's underwear, and retrieved a large amount of crack and powder cocaine near Williams's genitals." *Id*.

The Eighth Circuit rejected the suppression court's "bright-line rule that 'when a detainee has been secured, and travel to a station house is possible, an on-street inspection [is] an unconstitutional, unreasonable search.'" *Id*. at 977. The federal appellate court concluded instead that this search was a reasonable "reach-in" that was not performed in public view and not as intrusive "as a full-blown strip search." *Id.* at 976-77. The *Paulino* Court approved the federal court's observation that because "'a reach-in search of a clothed

29

suspect does not display a suspect's genitals to onlookers, . . . it may be permissible if police take steps commensurate with the circumstances to diminish the potential invasion of the suspect's privacy.'" *See Paulino*, 399 Md. at 359 n.6 (quoting *Williams*, 477 F.3d at 977).

Applying these lessons to the search of Paulino, the Court of Appeals concluded that because that search "was highly intrusive and demeaning" and not "shielded from the view of passers-by or the people present at the scene," it "required a higher degree of privacy than the search conducted in *Williams*." *Id*. at 356, 359-60. The Court found the State's "failure to prove exigent circumstances and the reasonableness of the search . . . determinative[,]" *id*. at 360, explaining that police had no reason to conduct that search in public view:

> **There was no testimony at the suppression hearing in the case *sub judice*, that Paulino was attempting to destroy evidence, nor that he possessed a weapon such that an exigency was created that would have required the police officers to search Paulino at that precise moment and under the circumstances, in a "well-lit" public car wash. There is no dispute that members of the public were present, specifically, the other passengers in the Jeep Cherokee. It is their presence, whether their view was obscured or otherwise, that makes the search of Paulino unnecessarily within the public view and thus violative of the Fourth Amendment. The police could have taken any number of steps,** including patting Paulino down for weapons at the scene of the arrest and conducting the search inside the Jeep Cherokee vehicle in which Paulino was a passenger, or at the police station, **to protect Paulino's privacy interest**. Similarly, the police could have conducted the search in the privacy of a police van. During the transportation of Paulino from the scene of the arrest to the station or to a more private location, the police had the ability to secure Paulino to prevent

30

> his destruction or disposal of the contraband found on his person. Instead, **they chose to search him in a public place in the view of others.** Accordingly, we hold that the search of Paulino unreasonably infringed on his personal privacy interests when balanced against the legitimate needs of the police to seize the contraband that Paulino carried on his person.

*Id.* at 360-61 (emphasis added; footnote and internal citation omitted).

### III.    Maryland Modality Cases Since *Paulino*

Since *Paulino*, this Court has considered modality challenges to the constitutionality of sexually invasive searches conducted in a variety of locations and circumstances that we found reasonable under the *Bell* standards.

In *Stokeling v. State*, 189 Md. App. 653, 658-59 (2009), *cert. denied*, 414 Md. 332 (2010), a traffic stop ripened into a canine alert, a pat-down search at the scene, and a transport of an occupant in the vehicle to the police station for a strip search. When an officer found "'a large bag of something in [the occupant's] crotch area'" and marijuana residue in the vehicle where he had been sitting, the officer had probable cause to arrest him. *Id.* at 659, 670. Because the officer did not believe the bag was a weapon but did suspect it was CDS, he "had probable cause to believe [the occupant] was in possession of drugs on his body" and transported the arrestee to the police station to perform a strip search. *Id.* at 669-70. After they arrived, before a search incident to arrest was performed, the arrestee voluntarily removed a large baggie of marijuana. *Id.* at 659, 670-71.

This Court observed that "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search," there can be no justification to search

in order to prevent concealment or destruction of evidence. *Id*. at 671. Rejecting a claim that it was unreasonable "to delay the search of the [arrestee's] person incident to arrest until he was taken the short distance to the police station[,]" we held that "the police were justified in searching him incident to arrest. That authority included removing him from a public place to a nearby police station to facilitate a strip search." *Id*. at 673-74.

In *Moore v. State*, 195 Md. App. 695 (2010), *cert. denied*, 418 Md. 192 (2011), a known drug trafficker was stopped and searched pursuant to a search warrant covering his person and vehicle. After searches at the scene of the traffic stop yielded nothing, he was taken to the precinct because officers "considered that location an appropriate private location to carry out the search." *Id*. at 716. In the presence of two male detectives, he "was directed to take off his clothes, bend over, and spread the cheeks of his buttocks." *Id*. at 701. When "the detective 'observed some plastic bag piece sticking out of his butt[,]'" the detective removed two baggies containing cocaine and heroin. *Id*.

This Court held that the search was incident to the search warrant and that it was reasonable under Fourth Amendment standards. *Id*. at 706-28. In doing so, we recognized that "[i]t is well known in the law enforcement community, and probably to the public at large, that drug traffickers often secrete drugs in body cavities to avoid detection." *Id*. at 718. Citing *Paulino* and *McGee*, we also acknowledged that

> [s]trip searches, and body cavity searches in particular, are to be conducted in places that are private and appropriately hygienic. **This will necessarily involve securing the search area from public view and may often involve transporting the person by vehicle to a more private and secure facility, such as a police station.**

*Id*. at 708 (emphasis added; footnote omitted). Regarding "the manner and place in which [that] strip search was conducted," this Court pointed out that it "was in a private room and observed by only two male officers. The search was progressive, beginning with a search of . . . outer garments, moving on to a strip search, and then to a visual body cavity search when the drugs were not found in the previous search efforts." *Id*. at 719.

In *Allen v. State*, 197 Md. App. 308, 312-13 (2011), two suspects who were observed selling cocaine on a city street were searched incident to their arrests for drug distribution. That search occurred next to "a series of storage garages" on a "a wide alley" with "residential homes on the other side of the block." *Id*. After each suspect's outer clothing and pockets were searched, detectives "pulled back" the waistband of each arrestee's pants and saw a plastic bag "protruding" from the buttocks. *Id.* at 312-13. After both arrestees were required to "spread [their] legs and squat[,]" detectives recovered from each a bag of narcotics. *Id*. Although additional police officers were present during these searches, there were no other witnesses and only the searching detective could see inside each suspects' pants. *Id.* at 313-14.

In characterizing this search mode as a "reach-in," this Court acknowledged "the conflicting definitions of the term 'strip search,'" but concluded that

> whether a "reach-in" search is classified as a strip search is not dispositive. To be sure, a "reach-in" search may be less invasive than a search requiring a suspect to remove his or her clothing. To the extent it allows an officer to view a person's private areas, however, it still is intrusive and demeaning.

33

*Id*. at 322-23 (citing *North Carolina v. Stone*, 653 S.E.2d 414, 418 (2007) (search of intimate area violates social expectations; "areas referred to as 'private parts' for obvious reasons")).

Applying the *Bell* factors, we found the scope, manner, and location of these searches reasonable:

> **Although a "reach-in" search that exposes a person's private area is invasive, and therefore not automatically permitted as a search incident to arrest, it is less invasive than a full strip search.** Here, the police officers merely pulled the appellants' pants and underwear away from their waist, at which point the police observed a plastic bag protruding from the appellants' buttocks. Appellants' clothing was not removed, and the private areas of their bodies were not publicly exposed. The officers took steps to protect appellants' privacy. In each case, the officer involved testified, and the court credited the testimony, that the officer stood directly behind the suspect, and he was the only one who could see appellants' buttocks during the search. The scope and manner of the searches were not unreasonable.
>
> **With respect to the location of the searches, appellants note that they occurred on a public street. Although that is true, the testimony was that the searches were conducted out of public view. The officers testified that the searches occurred in front of storage garages, not homes, and there were "no civilians in the area."**
>
> **A "reach-in" search may be reasonable under the Fourth Amendment, even if it occurs in a public place, if the police take steps to protect the suspect's privacy**.

*Id*. at 324-25 (emphasis added; citations and footnote omitted).

We distinguished *Paulino* based on its "substantially different" facts:

> With respect to the scope and manner of the search, the majority of the [*Paulino*] Court rejected the position taken by

34

the dissent that this was a "reach-in" search, stating that "the police did not only lift up Paulino's shorts, but also the officer manipulated his buttocks to allow for a better view of his anal cavity." Because the search in that case involved the "manipulation of the intimate parts of a suspect's person[,]" the Court held that the search was both a strip search and a visual body cavity search. It was the highly invasive nature of the search in *Paulino*, as well as the lack of evidence that Paulino's privacy was protected in any way that led the Court [of Appeals] to hold that exigent circumstances were required before such a search in a public place was reasonable.

*Id*. at 326-27 (emphasis added). Because these searches were "not as highly invasive[,]" and not conducted in a public location or in the presence of witnesses, we held they were "reasonable under the Fourth Amendment." *Id*. at 327.

In *Turkes v. State*, 199 Md. App. 96 (2011), this Court found a roadside reach-in search to be reasonable in exigent circumstances. When Turkes's vehicle was stopped at 11:45 a.m. for a suspected window tinting violation, he got out of the driver's seat and started walking away. *Id*. at 103-04. After being instructed to return to the vehicle, Turkes looked nervously at a black bag that was in the door well. *Id*. at 104. The stopping officer described the bag as the size of a tissue box, which raised his concern that it could contain a weapon or drugs. *Id*. While the officer was writing up an equipment violation, Turkes was moving around inside his vehicle in a manner the officer found "extremely suspicious." *Id*. at 104-05. The officer could not see Turkes's hands. *Id*. at 105.

When the officer asked Turkes to get out of his vehicle, the bag was no longer in the door well. *Id*. Although Turkes consented to a vehicle search, the officer did not find the bag. *Id*. at 106. When asked where it was, Turkes claimed it was trash that was

35

underneath his seat. *Id*. But the bag was not there. *Id*. Turkes then denied knowing which bag the officer was referring to. *Id*. Because the officer believed that the bag was on Turkes's person and likely contained a weapon or drugs, he conducted a pat down and felt "a very hard object" in Turkes's crotch area. *Id*.

When Turkes then ran, the officer tackled him, handcuffed him, and searched him. *Id*. at 106-07. The officer unfastened the front of Turkes's pants, lifted up his underwear, saw a black bag, and removed it. *Id*. at 107. The bag contained "'[f]our hundred . . . glassine baggies, a razor blade, and 40 grams of crack cocaine, as well as the black bag that was in the door well of the Cadillac.'" *Id*.

Neither the searching officer, nor anyone else saw Turkes's private parts. *Id*. at 107-08. Although "the search occurred in broad daylight in front of a public apartment complex and several single-family houses that faced the road[,]" and "the officers made no attempt to transport [Turkes] to the police station, which was 7-8 blocks away," as a result of the pat-down revealing a large hard object, "the exigency of the search outweighed any intrusion on [Turkes's] privacy." *Id*. at 128. The officer "was reasonably concerned that [Turkes] had not only drugs, but a *weapon* upon his person." *Id*. In these circumstances, we held that "the urgency of the search," which "was much greater than that in *Paulino* and *Allen*," "outweighed" the intrusion on Turkes's privacy. *Id.*

> More specifically, Officer Smith was confronted with the fact that the black bag, which was big enough to contain a weapon, was missing; that appellant had lied to him twice by telling him the bag was under the seat and then by telling him he did not know anything about a black bag; and that [Turkes] resisted the pat down and tried to flee when Officer Smith felt something

> hard in appellant's crotch area. **Because Officer Smith reasonably suspected that [Turkes] was hiding a weapon, an immediate and relatively intrusive search was warranted.** . . .
>
> The fact that [Turkes's] hands were cuffed behind his back does not alter our analysis. The officers could reasonably have feared that if they transported [Turkes] to the police station and [he] was indeed hiding a weapon between his legs, [he] could access the weapon while sitting in the back of the police vehicle.

*Id*. at 129 (emphasis added).

This Court approved another reach-in search under comparably exigent circumstances in *Partlow v. State*, 199 Md. App. 624 (2011). After receiving a tip that Partlow was selling drugs from his car at a certain location and time, police stopped him for a brake light violation. *Id*. at 644. A canine alert led to a search of Partlow. *Id*. at 630-31. A police officer "felt a hard object 'underneath Mr. Partlow's buttocks, within his clothes[,]" but was unable to remove it. *Id*. at 631. The officer pulled the waistband of Partlow's underwear away from his body and cut a cigarette-pack-sized piece out of the garment, leaving his buttocks partially exposed. *Id*. at 631, 644 n.11.

We concluded this search "fell somewhere between a reach-in and a strip search." *Id*. at 643. It was conducted "away from the view of traffic" behind "the passenger side of the police cruiser;" while the officer stood behind Partlow. *Id*. at 644. We noted that "the officer made some effort to protect [Partlow's] privacy[,]" and that Partlow "was wearing a long coat or shirt that covered his underwear, so the exposure was 'not as bad as it initially sounds.'" *Id*. at 645.

Regarding the location of the search, we observed,

> **"[a]lthough the search was undertaken on a public thoroughfare, the testimony showed that it was conducted in an area that was "fairly wooded"** on one side. The other side of the street did contain houses, but most of the houses were 30 to 40 yards away from the street, and the search did not occur in front of a house. Moreover, it was **"fairly dark"** at the time, and, as noted above, the suppression court found that [Partlow's] **coat or shirt covered the area he alleged was exposed**. Only police officers were present during the search; **no civilians were in the area**, and no cars stopped on the side of the road.

*Id.* (emphasis added).

In that setting, the officer was concerned that Partlow could dispose of any contraband:

> When asked by defense counsel if he could have taken appellant somewhere private to conduct the search, Schultz stated, "Not at that point" because **the officers "wanted to preserve the evidence, make sure it was not discarded in some way."** Although the suppression court agreed that it may "have been a nicer idea to do it in the confines of a room in a police station," it credited the officer's testimony that he took some precautions to ensure appellant's privacy and found that the small amount of exposed skin on his buttocks did not render the search unreasonable.

*Id.* (emphasis added).

Contrasting these circumstances with *Paulino*, this Court held that the search was reasonable:

> In the present case, the search was not as invasive as the one in *Paulino*. The search was brief, appellant was not disrobed, his private parts were not manipulated, and there were no non-police citizens around to view the cutting away of a small portion of appellant's underwear that was covered by a

38

> long shirt or coat.  After balancing the four *Bell* factors, we
> hold the search was reasonable under the Fourth Amendment.

*Id*. at 646.

More recently, in *Williams v. State,* 231 Md. App. 156, 185 (2016), *cert. denied*, 452 Md. 47 (2017), we found a visual body cavity search conducted at a police barracks to be reasonable.  In that case, a police sergeant received a tip from a confidential informant that Williams would be leaving a Narcotics Anonymous meeting and then making drug "drops" or sales in the Easton area.  *Id*. at 167.  The sergeant's ensuing investigation revealed that Williams's driver's license was suspended and revoked.  *Id*.  The sergeant went to the area identified by the informant, where he saw Williams driving.  *Id*.  Stopping Williams's vehicle in a parking lot, the sergeant arrested him for license violations.  *Id.*

In a search incident to arrest, the sergeant found $1,356 in cash on Williams' person, but nothing more of note.  *Id*.  Although Williams was cooperative during the search, he was nervous and "his chest was rapidly 'moving up and down,' the muscles in his neck 'were visibly contracting,' and he was sweating, even though the temperature was a mild 75 degrees."  *Id*.  Believing "'criminal activity was afoot' based on his prior contact with [Williams], the information from [the confidential informant], the large sum of cash, and [Williams'] nervousness[,]" the sergeant transported Williams to the Easton State Police Barracks.  *Id.* at 167-68.

In a secure area, away from public view, Williams was required, in the presence of two or three officers, to remove his clothing, "turn around, bend over, and spread his buttocks apart."  *Id*. at 168.  Although Williams refused the latter instruction, the sergeant

39

saw a plastic baggie protruding from Williams' rectum. *Id*. Because the sergeant was unable to retrieve the baggie when Williams "clenched his muscles[,]" he obtained a search warrant. *Id*. Medical personnel retrieved a baggie containing heroin and another containing crack cocaine. *Id*.

This Court concluded that before the body cavity search, the officer "saw what he believed to be a foreign substance." *Id*. at 178. "[A]lthough there were four officers present, the search took place in a secure area of a police barrack, not a public area." *Id*. In these circumstances, the manner and place of the search were reasonable:

> Weighing the *Bell v. Wolfish*, *supra*, factors, three of the factors weigh in favor of the State—the manner in which the search was conducted, where the search was conducted, and that the search was justified—and only one factor—the intrusiveness of the search—weighs in favor of [Williams]. Taking into account the relative strength of each factor and balancing the need to ferret out crime against the invasion of personal rights, we are persuaded that the strip search here was reasonable and legal.

*Id*. at 185.

## IV. The Suppression Court's Ruling

Here, the suppression court concluded that the roadside search of Faith was reasonable, ruling as follows:

> [T]he Court is here considering a fourth amendment argument from defense that narcotics that were found on the defendant's person were found in violation of the fourth amendment. The Court recognizes in this instance the narcotics were found on the defendant's person, and **the heavy scrutiny the Court puts on the search of somebody's person is certainly present in this case**, **because that's probably the area a**

40

**person has the most expectation of privacy that the Court can possibly consider is their private parts of their body.**

In this instance, **the defense argues that it was unreasonable for the search to take place that took place on the roadway.** The testimony is that the deputy pulled the vehicle over for a proper reason. It was following too closely. He noticed track marks on the defendant's arm and some other indications in her eyes and demeanor, I guess, is the testimony, that there may be personal drug use. The track marks, he didn't say whether they appeared to be fresh or not, but he did notice them.

For those reasons, he called the canine officer to come in to search or at least sniff the outside of the vehicle which is proper. It was done within a reasonable period of time, which the law requires. He also called in a female sergeant who, according to the testimony, happened to be out on the road as well and was actually in the median when the vehicle passed.

The dog did hit on the car. The car was searched. Certain items of contraband were found in the car, including a spoon and some items of drugs were found in the car itself. At that point, the female officer sergeant begins to search the person of the defendant in this case. **And the question the Court has to decide then is that search reasonable, because it did involve the search of her body parts, her personal body parts.**

So before the Court can decide whether a search is reasonable, it does have to factor the four factors that <u>Bell</u> requires under the Supreme Court case <u>Bell v. Wolfish</u>, 440 U.S. 520, which basically outlines the four factors of whether the Court determines something is reasonable or not. The scope -- and the Court did consider all of those things. In this case, **the scope of the search was considered.** The two cases that I think are most likely to follow along in this case are <u>Paulino v. State</u>, which the defense submitted, which is a Court of Appeals case from 2006 [sic]. The Court also considered the State's case that they submitted, which is <u>Partlow v. State</u>, which is a Court of Special Appeals case from 2009 [sic]. The Court considered both of those cases as well.

41

In this case, **the female officer that was going to conduct the search was cognizant of the defendant's privacy in this case.  She certainly took that into consideration according to her testimony and tried to limit this as unobtrusively towards her as she could.**  She brought her around at least one or two vehicles away from the other occupants of the vehicle.  She had her face away from the highway.  According to the uncontroverted testimony, at no time did she place her hands on the defendant other than to gently look at the track marks of her arm.  But not in conducting the search.

She asked the defendant to pull her underwear and pants – after she unbuttoned them – away from her body, and at that time, she saw what she believed to be a condom protruding from the front of the defendant's vagina.  So that was the scope, basically.  She was not asked to remove any items of clothing.  **She was simply asked to pull her clothing away from her body, and it was done outside – even though it was done outside, it was done away from anybody else and turned away from the highway.  So she was certainly taking into consideration the defendant's privacy.**

**The justification for initiating the search** the Court considered and the track marks on her arms – it's unclear when the items were found actually in the car, but there were narcotics found in the car, and the statements that the defendant made were all used as justification for initiating the search and the Court does find that to have been reasonable under the circumstances as well.

**The Court considered the place of the search.  It was out on the highway, and certainly that takes more scrutiny from the Court, because it's not a private area.  However, the Court is convinced from the testimony of the sergeant that she had done everything she could to make this as private as possible.  There were no body parts exposed in any way other than the deputy herself could see.  And it was again, just the top of the genital area.**  There was not what this Court would determine as the defense argues, to be a body cavity search, which would involve seeing the defendant's genitalia from a different angle – it could have

42

been considered a body search.  But the way this angle was considered from above, the Court does not consider that to be a body cavity search.

**The manner of the search again was done on the side of the highway, but it was done in such a manner to take into consideration the defendant's privacy as much as was possible under the circumstances of the case.**

So the Court does find the search in this case was reasonable under all of the circumstances, the totality of the circumstances, and considering the factors in <u>Bell</u>, and therefore the motion to suppress that evidence is denied.

As far as the statement goes, . . . . the defendant was in a custodial situation when the sergeant asked her certain questions . . . in reference to what might be on her person at that time.

Those were done prior to the deputy making the <u>Miranda</u> warnings, and since she was in custody, I would suppress those statements. . . .

Come on.  Because you're basically saying, come on, admit this.  So while that's not a posed question, the cases are pretty clear that any statement that could be foreseen to potentially elicit a statement is considered a question[.]

(Emphasis added.)

## V.    *Bell* **Analysis**

A search that permits a police officer to view a suspect's private areas "is not the type of search that automatically is allowed as a search incident to arrest." *Allen v. State*, 197 Md. App. 308, 323 (2011).  Applying the analytical framework established by *Bell*, we must consider the manner and location of the challenged search, in light of its scope and justification, to balance the need for this roadside search against the invasion of

43

personal rights that the search entailed. *See Paulino v. State*, 399 Md. 341, 355 (2007); *Williams v. State*, 231 Md. App. 156, 185 (2016); *Allen*, 197 Md. App. at 323.

### A. Scope of the Search

In response to questioning by the suppression judge, Sergeant Ensor testified that she viewed Faith's genitalia. Specifically, the sergeant saw a condom protruding from Faith's vagina. After finding that this search was not a body cavity search, the suppression court recognized that it was a visual body search of Faith's genital area.

As the Court of Appeals has acknowledged, "the term 'strip search' has been defined and used in differing contexts in Fourth Amendment jurisprudence." *State v. Nieves*, 383 Md. 573, 586 (2004). Although "[i]n general, strip searches involve the removal of the arrestee's clothing for inspection of the underclothes and/or body[,]" "[s]ome have defined strip searches to also include a visual inspection of the genital and anal regions of the body" or "any search of an individual requiring the removal or rearrangement of some or all clothing to permit the visual inspection of the skin surfaces or the genital area, breast, and/or buttocks." *Nieves*, 383 Md. at 586. *See also Allen*, 197 Md. App. at 321-23 (reviewing range of definitions and classification for the terms "strip search" and "reach-in search"). In *Paulino*, 399 Md. at 352, the Court described a strip search as "'an umbrella term'" referring to an "inspection of a naked individual without any scrutiny of the subject's body cavities[,]" then stated that "'[a] 'visual body cavity search' extends to a visual inspection of the anal and genital areas."

Whether the search of Faith qualifies as a visual body *cavity* search based on Sergeant Ensor's external inspection of Faith's vagina, it was undisputedly a visual body search because the sergeant required the rearrangement of clothing to enable her to view Faith's vaginal area. It also falls within the Fourth Circuit's definition of "sexually invasive search" as a "search involv[ing] 'movement of clothing to facilitate the visual inspection of a [person's] naked body.'" *See Sims*, 88 F.3d at 261 (citation omitted).

Rather than using the term "strip search" as our umbrella for all intrusive search modes, including those that do not involve the removal of clothing or the internal inspection of body cavities, we shall use the term sexually invasive search. For the particular search mode in Faith's case – a visual inspection of her external genital area, with no removal of clothing, no touching, and no visual inspection of internal body cavities – we will use the terms visual body search or "look-in" search. Like a "reach-in" search in which clothing is manipulated to enable a police officer to reach in and retrieve the contraband without exposing the arrestee's private areas to others, a "look-in" search involves manipulating clothing so that a police officer can visually inspect external genitalia. Although look-in searches and reach-in searches often go together, this search illustrates that is not always the case. *Cf. Turkes,* 199 Md. App. at 128 (reach-in search accomplished without looking).

Look-in and reach-in searches typically are less invasive than strip searches requiring removal of clothing and body cavity searches involving inspection of internal genital and anal cavities. *See Allen*, 197 Md. App. at 324-25. *Cf. Sims*, 885 F.3d at 261 ("magnitude of the intrusion is greater" when "the scope of a search exceeds a visual

45

inspection"). But such searches cannot be treated as reasonable *per se* because any sexually invasive search that allows a government agent to view a person's private areas is "still intrusive and demeaning." *Allen*, 197 Md. App. 322-23. This reflects that "[w]e accept as axiomatic the principle that people harbor a reasonable expectation of privacy in their 'private parts'" and the corollary "belief that people have a reasonable expectation not to be unclothed involuntarily, to be observed unclothed or to have their 'private' parts observed or touched by others." *Nieves v. State,* 160 Md. App. 647, 661 (quoting *Justice v. Peachtree City*, 961 F.2d 188, 191 (11th Cir. 1992) and *Doe v. Calumet City, Ill*, 754 F. Supp. 1211 (M.D. Ill. 1990)), *aff'd*, 383 Md. 573 (2004).

Indeed, the Supreme Court has recognized that any reasonable person would be distressed by an involuntary inspection of her genital area, regardless of whether that view was restricted to the searching official. In finding a sexually invasive search of a student unreasonable under Fourth Amendment standards, the Court observed:

> The exact label for this final step in the intrusion is not important, though strip search is a fair way to speak of it. Romero and Schwallier directed Savana to remove her clothes down to her underwear, and then "pull out" her bra and the elastic band on her underpants. **Although Romero and Schwallier stated that they did not see anything when Savana followed their instructions, we would not define strip search and its Fourth Amendment consequences in a way that would guarantee litigation about who was looking and how much was seen. The very fact of Savana's pulling her underwear away from her body in the presence of the two officials who were able to see her necessarily exposed her breasts and pelvic area to some degree, and both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of**

> **justification** on the part of school authorities for going beyond
> a search of outer clothing and belongings.

*Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 374, 129 S. Ct. 2633, 2641 (2009) (emphasis added). *Cf. Porter v. Indiana*, 82 N.E.3d 898, 904 (Ind. Ct. App. 2017) ("It would be hard to contest an assertion that one's pubic area is a private area of the body that merits special protections."); *North Carolina v. Battle*, 688 S.E.2d 805, 814 (N.C. Ct. App. 2010) ("Whether anyone other than Detective Curl actually saw Defendant's private parts during the search is irrelevant to the Fourth Amendment analysis").

Consequently, whether anyone other than Sergeant Ensor actually saw Faith's vaginal area during the search is not a determinative factor in our *Bell* analysis. Although we find the scope of Faith's search reasonable for Fourth Amendment purposes, we remain mindful that "[t]o the extent it allow[ed] an officer to view [her] private areas, . . . it is still intrusive and demeaning." *Allen*, 197 Md. App. at 322-23.

### B.    Justification for Initiating the Search

When a K-9 dog alerts to the presence of narcotics in a vehicle, a police officer has probable cause to undertake a warrantless arrest of the driver. *See Partlow*, 199 Md. App. at 644. Police may search the person of the arrestee to remove any weapons or recover evidence that could be concealed or destroyed. *See Belote v. State*, 411 Md. 104, 113 (2009).

A sexually invasive search may be conducted incident to arrest if police have a reasonable articulable suspicion that the arrestee is concealing drugs on her body. *See Nieves*, 383 Md. at 596; *Allen*, 197 Md. App. at 323. In the case of an arrest for drug

distribution, "the nature of the offense provides reasonable suspicion to believe that the arrestee is concealing drugs on his or her person." *Allen*, 197 Md. App. at 324. This reflects that it is "'well known in the law enforcement community, and probably to the public at large, that drug traffickers often secrete drugs in body cavities to avoid detection.'" *Id*. at 324 (quoting *Moore*, 195 Md. App. at 718).

Faith does not contest that police had grounds to conduct a pat-down search when she exited her vehicle and to search her vehicle following the canine alert. Nor does she dispute that the canine alert and subsequent discovery of drug paraphernalia and cocaine in her car justified both her arrest and a search of her person for CDS. [4] Although Faith does not renew the challenge she raised at the suppression hearing as to whether the State had sufficient justification for initiating a sexually invasive search based on a mere "hunch"

---

[4] As the suppression court acknowledged, the record is equivocal as to whether the cocaine and paraphernalia in Faith's car were discovered before Sergeant Ensor began to search Faith. Although Deputy Storee did not specify at what point he called the sergeant in to conduct a "female search," and could not recall when Sergeant Ensor arrived, she testified that Storee was in the process of conducting the vehicle search when she arrived and that she questioned Faith in an effort to "build" reasonable suspicion for her search.

The suppression court determined that "[t]he justification for initiating the search was "the track marks on [Faith's] arms" and "the statements that the defendant made[.]" Yet the court later excluded those statements on the ground that they were the result of unconstitutional custodial questioning that occurred before Faith was given *Miranda* advisements.

Although Faith does not argue that the court's justification analysis was tainted by its consideration of Faith's excluded statements, our task is to make an independent constitutional appraisal based solely on the suppression record. *See Taylor v. State*, 448 Md. 242, 244 (2016). Because Faith's pre-search statements to Sergeant Ensor were excluded, we do not consider them for purposes of our *Bell* analysis.

she had concealed CDS, she insists that the lack of exigent circumstances for conducting such an invasive search in a highly public manner and location made it unreasonable. We examine those related factors next. *See Williams*, 231 Md. App. at 178 (considering together these "closely related" factors).

## C. Manner and Location of the Search

The suppression court recognized that heightened constitutional scrutiny is required because "the place of the search . . . . was out on the highway[,]" which is "not a private area." Nevertheless, the court found "from the testimony of the sergeant that she had done everything she could to make this as private as possible[,]" so that Faith's search "was done in such a manner to take into consideration the defendant's privacy as much as was possible under the circumstances[.]" In support, the court cited the fact that "no body parts [were] exposed in any way other than the deputy [sic] herself could see" and "it was . . . just the top of the genital area."

Faith argues that in holding that this highly public search was reasonable, the suppression court "misapplied" the *Bell* factors and "ignored specific facts which brought this case within the scope of *Paulino*[,]" including that the search "took place in front of civilians[,]" "that there were no exigent circumstances[,]" and that "Ensor at no time testified that it would be unfeasible or that it would risk destruction or loss of evidence should Faith's search be delayed until they reached a police station." In Faith's view, the suppression court "over focused on Ensor's 'cognizance' of Ms. Faith's privacy and ignored that Ensor still viewed the top of Ms. Faith's genital area while her companion and

49

son stood by, along an interstate highway where passing motorists could also see that search taking place, and the sergeant did so without exigent circumstances." Nor did Ensor "explain why the strip search was not done at the police station or at least in a car or cruiser at the scene." Here, "[a]s in *Paulino*," Faith contends, the State failed to "demonstrate that there was any exigent circumstances to justify such a public intimate strip search" because "there was no testimony . . . that Ms. Faith was attempting to destroy any evidence or that she possessed a weapon that would have placed Ensor or other officers in danger." Indeed, Faith points out, the suppression court "did not even take into account that there were no exigent circumstances" to justify a sexually invasive search at the scene of this traffic stop.

The State responds that Faith waived her challenge to the lack of exigency because she "did not argue below, as she now appears to argue on appeal, that the *Bell* analysis is accompanied by a free-standing exigency test." Moreover, the State continues, "[a]ny exigency beyond the inherent exigency attributable to the 'easily disposable nature of the drugs,' is less significant in cases like *Allen*, *Partlow*, and this one, where the searches were 'not as intrusive as the one in *Paulino*.'" In support, the State points to this Court's statement in *Allen* that "[i]t was the highly invasive nature of the search in *Paulino*, as well as the lack of evidence that Paulino's privacy was protected in any way, that led the Court to hold that exigent circumstances were required before such a search in a public place was reasonable." *Allen*, 197 Md. App. at 326-27.

We are satisfied that Faith preserved her right to challenge the suppression ruling on the ground that the motion court failed to address the lack of exigency for this search.

50

As the suppression record detailed above shows, both the prosecutor and defense counsel questioned Sergeant Ensor about why Faith was not taken to the Law Enforcement Center to be searched. Based on Ensor's testimony, defense counsel and the prosecutor argued over whether, under *Paulino* and *Partlow*, this search specifically, as well as the Frederick County Sheriff's Department's routine practice of conducting sexually invasive roadside searches generally, violates the Fourth Amendment. This was sufficient to preserve Faith's appellate arguments.

On the merits, we are not persuaded that, by itself, shielding others from viewing an arrestee's private parts while a sexually invasive search is taking place in public view at a public location amounts to "taking into consideration . . . privacy as much as was possible[.]" As courts consistently recognize, having a government agent visually inspect one's genital area is traumatic – "'accurately described as demeaning, dehumanizing, undignified, humiliating, embarrassing, repulsive, degrading, and extremely intrusive of one's personal privacy.'" *Paulino*, 399 Md. at 356 (citation omitted); *see Allen*, 197 Md. App. at 322-23. Moreover, that privacy invasion extends beyond distress in submitting to a law enforcement officer's examination of one's private parts, to the indignity of having others witness that such a search is taking place. *See, e.g., Paulino,* 399 Md. at 360 (holding that presence of "members of the public," including arrestee's companions, made "the search unnecessarily within the public view and therefore violative of the Fourth Amendment"); *Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981) ("'[N]o police officer in this day and time could reasonably believe that conducting a strip search in an area

51

exposed to the general view of persons known to be in the vicinity whether or not any actually viewed the search is a constitutionally valid governmental 'invasion of (the) personal rights that (such a) search entails.'") (citation omitted)).

Consequently, "[t]he question whether a sexually invasive search is conducted in a private or a public setting is 'especially relevant' to [a] determination of reasonableness." *Polk v. Montgomery County*, 782 F.2d 1196, 1201-02 (4th Cir. 1986). Although every sexually invasive search "need not be conducted in a private holding cell to adequately safeguard a suspect's privacy interests, we consider whether a sexually invasive search could have been viewed by others, and whether it was in fact viewed by others, in our analysis of the reasonableness of the search." *Logan*, 660 F.2d at 1014.

Here, the suppression record establishes that Faith's search was both actually and potentially witnessed by onlookers. We acknowledge that Sergeant Ensor's efforts to shield Faith, so as to avoid exposing her private parts to onlookers, demonstrates cognizance of Faith's privacy rights. Although we agree with the suppression court that this was a reasonable and necessary measure, nevertheless, we are mindful that Faith's companion and child, as well as passing motorists, could observe that the search was occurring. She was wearing very brief shorts and a sleeveless shirt, which made it difficult for her to conceal contraband in her clothing but easy for onlookers to see that her private parts were being inspected by Sergeant Ensor. And Faith was aware of those onlookers. Even if we credit Sergeant Ensor's testimony that Faith was not facing directly into oncoming traffic during the search, rather than both deputies' testimony that she was, Faith

52

was required to unzip and open the front of her shorts, then hold out her underwear for Sergeant Ensor to look in, while moderate to heavy traffic drove past and her companion and son waited within view.

As in *Paulino*, "their presence, whether their view was obscured or otherwise, . . . makes the search . . . unnecessarily within the public view[.]" *Paulino*, 399 Md. at 360. We agree with Faith that under *Paulino* and its progeny, the State bears the burden of establishing a "legitimate" law enforcement need to conduct a sexually invasive search in public view at the scene of a traffic stop, rather than in a more private manner and location.

In *Paulino,* the Court expressly required proof of such exigent circumstances, in reasoning that bears repeating here:

> **[T]he State contends that because the search did not occur on the side of a well-traveled highway and was conducted at night; the search, therefore, was reasonable. The State appears to overlook that its failure to prove exigent circumstances and the reasonableness of the search are determinative**. As we have noted previously, "the burden is on those seeking the exemption [from the warrant requirement] to show the need [for the search]." **There was no testimony at the suppression hearing . . . that Paulino was attempting to destroy evidence, nor that he possessed a weapon such that an exigency was created that would have required the police officers to search Paulino at that precise moment and under the circumstances, in a "well-lit" public car wash**. **There is no dispute that members of the public were present. Specifically, the other passengers** . . . **The police could have taken any number of steps,** including patting Paulino down for weapons at the scene of the arrest and conducting the search inside the Jeep Cherokee vehicle in which Paulino was a passenger, or at the police station, to protect Paulino's privacy interest. Similarly, the police could have conducted the search in the privacy of a police van. During the transportation of Paulino from the scene of the

> arrest to the station or to a more private location, the police had the ability to secure Paulino to prevent his destruction or disposal of the contraband found on his person. Instead, they chose to search him in a public place in the view of others. Accordingly, **we hold that the search of Paulino unreasonably infringed on his personal privacy interests when balanced against the legitimate needs of the police to seize the contraband that Paulino carried on his person.**

*Paulino*, 399 Md. at 319-20 (emphasis added; citation and footnote omitted).

This case presents "in real life" the same scenario that the State proffered in *Paulino* as a hypothetical example of an unconstitutionally public search, *i.e.*, a sexually invasive search "on the side of a well-traveled highway," in daylight with no exigent circumstances explaining why the search occurred in public view at the scene of the arrest. Far more than the secluded car wash in *Paulino* or the unoccupied city streets in *Allen* and *Partlow*, an interstate highway is a quintessentially public location.

The brevity of such a sexually invasive search cannot render it reasonable "where there was no exigency." *Partlow,* 199 Md. App. at 356. The lesson from *Paulino* is that the State must establish some constitutionally relevant and non-pretextual justification for immediately conducting a sexually invasive roadside search. As the *Paulino* Court explained, the State bears the burden of establishing a legitimate need to proceed with such a search "at that precise moment" instead of taking steps to protect privacy, such as by transporting Faith to the police station or conducting the search in a vehicle. *See id.* at 360-61.

We are not persuaded by the State's contention that establishing exigency is less important because a look-in search, like a reach-in search, is not as intrusive as a strip

54

search or body cavity search. This ignores the "intrusive and demeaning" nature of submitting to an involuntary visual inspection of genitals by a government agent. *See Allen*, 197 Md. App. at 622-23. *Cf. Redding*, 557 U.S. at 374, 129 S. Ct. at 2641 ("The very fact of . . . pulling her underwear away from her body in the presence of the two officials who were able to see her necessarily exposed her breasts and pelvic area to some degree, and both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct . . . ."); *Paulino*, 399 Md. at 356 ("[S]earches that entail the inspection of the . . . genital areas" are "extremely intrusive of one's personal privacy.") (quotation and citation omitted).

This Court's decisions in *Allen*, *Partlow* and other modality cases do not relieve the State of its burden to prove that the public manner and location of this sexually invasive search were reasonable. In contrast to this case, the suppression records in those cases established materially different privacy and exigency grounds justifying those searches.

In *Allen*, 197 Md. App. at 312-13, 324-26, it was reasonable to conduct reach-in searches of two men arrested on a Baltimore street just after police officers observed them selling cocaine. Both searches were conducted out of public view, at night, near closed storage garages, next to parked cars, while "there were no civilians in the area." *See id*. at 314.

In *Turkes*, 199 Md. App. at 104-07, 128-29, a roadside reach-in search during a traffic stop was reasonable given an exigency that outweighed the lack of private manner and location. After the driver fled and repeatedly lied about a suspicious black bag that

55

went missing during the stop, and a pat-down revealed an object the officer believed might be a weapon, "an immediate and relatively intrusive search was warranted." *Id*. at 129.

In *Partlow*, 199 Md. App. at 627, 644-45, a reach-in search after a canine alert "was not as invasive as the one in *Paulino*" because, although it occurred "on a public thoroughfare," it "was fairly dark" and in front of the wooded portion of a residential area, where "there were no non-police citizens around to view the cutting away of a small portion of . . . underwear that was covered by a long shirt or coat." *Id*. at 646. According to the arresting officer, moreover, seizing the suspected contraband revealed by the pat-down search in this manner was necessary to "'make sure it was not discarded in some way.'" *Id.* at 645.

This suppression record does not establish comparable grounds for conducting a visual body search in the manner and location that exposed Faith to public view. She made no attempt to flee. Police did not find anything during the pat-down of Faith's outer garments that might indicate the possible presence of a weapon. Unlike *Allen*, *Partlow*, and other searches conducted out of public view because of location or lighting conditions, this search was conducted in daylight, on the shoulder of an interstate highway, between two police cruisers with their emergency lights flashing, as Faith's companion and child stood a car-length away, while moderate to heavy traffic drove past. Although Faith was positioned so that no one except Sergeant Ensor could view her genital area, the search took place in full public view as Faith opened her shorts and held out her underwear.

In contrast to *Turkes* and other cases in which exigencies had a mitigating effect, the State established no comparable reason for searching Faith along Interstate 70 instead of a more private location.  Indeed, Sergeant Ensor did not identify any.  When asked why she did not transport Faith to a more private location, the sergeant expressed no concerns about her personal safety or that Faith would flee or dispose of contraband.  *Cf. Porter*, 82 N.E.2d at 907 ("When Officer Wren . . . insert[ed] her hand into Porter's pants, with no voiced concerns about officer safety or destruction of evidence, the search became unreasonable.").

Instead, Ensor answered generally, explaining that she sometimes performs roadside searches for medical reasons, when CDS is secreted in body cavities.  Yet neither Ensor nor the other officers claimed that they believed Faith was in medical distress.  The other generalized reason cited by Sergeant Ensor was her belief that a visual body inspection is a lesser privacy intrusion that would avoid a "full-blown strip search" at the police station.

Yet sexually invasive searches may not be conducted in public view solely for the convenience of law enforcement officers.  Although police may obtain consent to search at the scene, Sergeant Ensor instead announced that she was going to search Faith, including her vagina, without giving Faith any option to be searched at the Law Enforcement Center or a less public location.[5]  Nor did Ensor explain why this search could

---

[5] It was not until after the search revealed the condom protruding from Faith's vagina that Sergeant Ensor offered Faith the choice to remove it at the scene or at the Law Enforcement Center.

not wait until Faith, who was already subject to arrest based on the canine alert, was taken to a more private location, or, alternatively, why she did not conduct this search in one of the four vehicles at the scene of this traffic stop. *Cf. Harding*, 196 Md. App. at 396 ("[T]he situs of the . . . search was moved" from a public road where the traffic stop occurred "to the precinct station in order to insure maximum privacy . . . ."); *Williams*, 231 Md. App. at 178 (explaining that place and manner of visual body cavity search following arrest for driving on revoked license was reasonable because it "took place in a secure area of a police barrack, not a public area"); *Stokeling*, 189 Md. App. at 673-74 (concluding that search was justified when police reasonably delayed sexually invasive search until arrestee was transported to police station). *See also Williams*, 477 F.3d at 975 (holding that search was not unreasonable when, among other factors, police "decided not to search" at scene of "traffic stop on a busy street" and took arrestee to precinct "because they were concerned about his privacy"); *McGee*, 105 S.W.3d at 617 (considering the location of a search when evaluating its reasonableness and observing that, after transporting arrestees to nearby fire station, police conducted separate visual inspections of arrestees' buttocks in private room). Moreover, Sergeant Ensor did not explain why she assumed that a full-blown strip search at the police station would be necessary, even though, according to her own expertise and experience, a look-in search would be effective in discovering concealed CDS. *Cf. Moore*, 195 Md. App. at 719 (approving a progressively invasive search at police station, "beginning with a search of . . . outer garments, moving on to a strip search, and then to a visual body cavity search when the drugs were not found in the previous search efforts").

58

We discern nothing unusual or exigent about this traffic stop that created a need to conduct this sexually invasive search in such a public manner and location. To the contrary, according to Sergeant Ensor, it was one of "thousands" of similar "female searches" (some of which involve skin-to-skin contact) she has performed over fifteen years. Here, as in most other instances she described, the search occurred after the sergeant was called to the scene of a stop that generated suspicions of drug activity. She followed her "systematic" protocol, from her un-*Mirandized* questioning designed to "build" the reasonable suspicion necessary to conduct a search, to her announcement that she was going to search Faith's vagina, through her placement of Faith behind her cruiser, her instructions to Faith to open up her shorts and hold out her underwear, and her inspection of Faith's external genital area.

"Without the constitutional safeguards of exigent circumstances and reasonableness, every search incident could result in a [sexually invasive] search." *Paulino*, 399 Md. at 351. As in *Paulino*, we are concerned that without any showing by the State that police had a legitimate need to conduct this type of sexually invasive search on the side of a public roadway, every search incident to a traffic stop arrest involving suspected CDS could trigger a visual body search, even in the most public of circumstances.

Indeed, as this record reveals, the Frederick County Sheriff's Department has already established a systematic practice of conducting such roadside searches, rather than taking the privacy steps suggested by *Paulino*, *Moore*, *Williams*, and other cases, such as

59

conducting searches inside a vehicle or at a police station. *See id.* at 360-61. What the collective testimony of Sergeant Ensor, Deputy Storee, and Deputy Yackovich, as well as the arguments made by the State, make clear is that the Frederick County Sheriff's Department is operating under the premise that, even when conducted in public view, a look-in search conducted by a single police officer of the same gender, is permissible because the scope of such a search is not "unreasonably" invasive.

This premise cannot be reconciled with the Fourth Amendment principles articulated in *Paulino,* that searches involving "the inspection of the . . . genital areas" are "extremely intrusive of one's personal privacy" and should not be conducted in public view absent exigent circumstances. *See id.* at 356. It also ignores that "*Bell* requires a flexible approach . . . that takes into account the relative strength of each factor" and balances "the need for a particular search against the invasion of personal rights that the search entails." *Id*. at 355. *Accord Williams*, 231 Md. App. at 185 (when determining the reasonableness of the strip search, the Court takes "into account the relative strength of each factor and balance[es] the need to ferret out crime against the invasion of personal rights"). *Cf. Massachusetts v. Morales*, 968 N.E.2d 403, 411 (Mass. 2012) ("With no exigency existing, the defendant should have been transported to a private space or location."); *Battle*, 688 S.E.2d at 824 (rejecting "a *per se* rule that roadside searches of suspects are allowed . . . so long as some measures are taken to shield the suspects' private parts from public view.").

In these circumstances, Sergeant Ensor did not do everything she reasonably could to protect Faith's privacy. Instead, we conclude that the unreasonably public manner and location of this search weighs heavily against the State in our *Bell* calculus.

### D.  *Bell* **Balancing**

We agree with Faith that the suppression court "did not properly apply the four *Bell* factors and did not properly apply *Paulino* to the facts in this case." Although this look-in search did not involve the physical contact that occurred in *Paulino*, it required the rearrangement of clothing to allow "inspection of the anal and/or genital areas[,]" a search the Court of Appeals has characterized as "extremely intrusive of one's personal privacy." *Paulino*, 399 Md. at 356 (citation and quotation marks omitted). And it occurred in view of not only the other occupants of her vehicle, but also motorists.

As in *Paulino*, the suppression court did not hold the State to its burden of establishing sufficient grounds for conducting a warrantless sexually invasive search in public view at a public location. There was no testimony that Faith was attempting to destroy evidence or that police suspected that she possessed a weapon "such that an exigency was created that would have required the police officers to search [her] at that precise moment and under the[se] circumstances[.]" *See id.* at 359. We are not persuaded that this search was reasonably necessary "to prevent . . . destruction or disposal of contraband" concealed on her person based on what the State views as "the inherent exigency attributable to the 'easily disposable nature of the drugs,'" because "[d]uring the transportation of [Faith] from the scene of the arrest to the station or to a more private

61

location, the police had the ability to secure" her. *See id.* at 360-61. The three police officers at the scene "could have taken any number of steps, including . . . conducting the search inside" Faith's vehicle, one of the three police cars on the scene, "or at the police station, to protect [Faith's] privacy interest." *See id.* at 359. "Instead, they chose to search [her] in a public place in the view of others." *See id.*

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell*, 441 U.S. at 559, 99 S. Ct. at 1884. Although the scope of Faith's search was reasonable, she does not directly challenge the justification for initiating it, and Sergeant Ensor prevented others from viewing Faith's private parts, this roadside search was conducted in a manner and location that unreasonably exposed Faith to public view.

As in *Paulino*, "on balance, the location of the search and the lack of exigency made the search . . . unreasonable." *Paulino*, 399 Md. at 355. In holding a comparable search unconstitutional, one of our sister courts observed that "this was a routine encounter with no justification for an invasive roadside search." *Porter*, 82 N.E.2d at 906. Although a visual body search might be reasonable under the Fourth Amendment when it occurs during such a "routine encounter" in a public place, if the police take reasonable steps to protect the arrestee's privacy so as to remove or shield the search itself from public view, *see Allen*, 197 Md. App. at 324-25, that did not happen here. When, as in this case, the police choose to conduct a non-exigent look-in search in a public setting, constitutional constraints require measures beyond simply shielding others from viewing private parts. Here, the

non-exigent visual inspection of the genital area of a person suspected of concealing CDS occurred in the daylight, while Faith stood between two police cruisers with emergency lights flashing, along the shoulder of an interstate highway, as moderate to heavy traffic passed. Indeed, Faith's companion and three-year-old child were present as the search occurred. Under these circumstances, we hold that the search violated Faith's Fourth Amendment right to be free from unreasonable searches.

For these reasons, we hold that that the search of Faith "unreasonably infringed on [her] personal privacy interests when balanced against the legitimate needs of the police to seize the contraband that [she] carried on her person." *See Paulino,* 399 Md. at 361. Because the State failed to establish that the warrantless roadside search was reasonable, the suppression court erred in denying Faith's motion to exclude the drug evidence obtained as a result of that unconstitutional search. *See id.* Accordingly, we shall reverse her conviction.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR FREDERICK COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY FREDERICK COUNTY.**